## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIMBUS THERAPEUTICS, LLC and NIMBUS LAKSHMI, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CELGENE CORPORATION and BRISTOL-MYERS SQUIBB COMPANY, <br><br> Defendants. | **Case No. 1:21-cv-6850** <br><br> **Civil Action** <br><br> **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiffs Nimbus Therapeutics, LLC and Nimbus Lakshmi, Inc. (collectively, "Nimbus" or "Plaintiffs"), by their attorneys, Goodwin Procter LLP, bring this Complaint against Celgene Corporation ("Celgene") and Bristol-Myers Squibb Company ("BMS") (collectively "Defendants") and allege as follows:

### NATURE OF THE ACTION

1.    This case is about whether a potential therapy being developed by a small company will be the latest victim of the anticompetitive $80 billion mega-merger of BMS and Celgene (the "Acquisition").  BMS's acquisition of Celgene is a breach of the Alliance Agreement and Warrant to Purchase Stock between Celgene and Nimbus (the "Agreement") and violates the antitrust laws.  The Agreement between BMS-controlled Celgene and Nimbus should thus be terminated to allow Nimbus—BMS's most advanced competitor in the market—to continue its efforts to develop its own medicine to challenge BMS's future blockbuster medicine.

2.      On September 21, 2017, Nimbus entered into the Agreement with Celgene with the express objective of developing a drug candidate directly competitive with BMS's clinical lead, which would ultimately be called, deucravacitinib, an allosteric inhibitor of the tyrosine kinase 2 ("Tyk2") in development for rheumatological conditions.  At the very first Joint Steering Committee meeting between the two companies, Celgene and Nimbus agreed that the "competitive benchmark" for their collaboration was the "BMS clinical lead."

3.      Indeed, over the first two years of this collaboration with Celgene, Nimbus earnestly pursued the development of an allosteric Tyk2 inhibitor to be in direct competition with BMS.  Both of these drug candidates take aim at older drugs that have been approved for various rheumatological conditions.  In particular, BMS has set a course for deucravacitinib to displace Otezla (generically known as apremilast) as the dominant product used for orally administered therapy for patients battling moderate-to-severe psoriasis.  In turn, Nimbus had set its course to challenge deucravacitinib.

4.      At the time Celgene and Nimbus agreed to collaborate, the legacy dominant product, Otezla, was owned by Celgene.  In other words, BMS was developing deucravacitinib to displace Celgene's Otezla with an allosteric Tyk2 inhibitor and Celgene was responding by supporting Nimbus to compete against this new technology with the only other allosteric Tyk2 inhibitor.  Celgene's collaboration with Nimbus to compete against its competitor, BMS, was a textbook example of a procompetitive collaboration between a large pharmaceutical company and an innovative small life sciences company to develop new therapies for the benefit of the patient population.  Celgene faced competition from BMS's future allosteric Tyk2 product (deucravacitinib, neé BMS-986165) and it chose to encourage more competition by collaborating

with a small company that was pursuing a potential drug that would take on BMS's future blockbuster product.

5.      Under the Agreement, subject to various triggering events, Celgene had an option to acquire the Nimbus subsidiary created to hold the intellectual property and other rights to Nimbus's allosteric Tyk2 program (Nimbus Lakshmi, Inc.) (the "Warrant").  It was understood between the parties that the exercise of the Warrant would be subject to antitrust review by the relevant agencies.  Nimbus properly perceived that an objection to the exercise of the Warrant would be an unlikely event given the procompetitive nature of their relationship.  Still, Celgene agreed that it would not violate "any Applicable Law . . . to the extent that such breach or violation would have a material adverse impact on Celgene's ability to consummate the transactions contemplated hereby," Section 5.3, and it would "use commercially reasonable efforts to comply with, and [] refrain from taking any action that would impede compliance with, all Applicable Laws [including federal antitrust laws] . . . ," Section 6.8.

6.      The procompetitive nature of the Celgene-Nimbus relationship ended on January 2, 2019, when Celgene, in breach of its obligations to Nimbus under Sections 5.3 and 6.8 of the Warrant, agreed to a transaction whereby its competitor BMS would acquire all of the voting securities of Celgene in a $80 billion transaction.  As proposed, the Acquisition would have brought the legacy product Otezla under BMS's effective control, as well as its two nascent allosteric Tyk2 inhibitor competitors.

7.     A timeline of the key events illustrates the competitive landscape to develop and launch the allosteric Tyk2 products:



8.     The Federal Trade Commission ("FTC") reviewed the proposed Acquisition and determined that it had reason to believe that Celgene and BMS have violated the antitrust laws. By a 3-2 vote, the FTC decided against filing a complaint to block the transaction when Celgene and BMS agreed to reduce the anticompetitive effect by divesting Otezla to Amgen.  To be sure, the FTC effectively "settling" and choosing not to allocate resources to fight this unlawful transaction in a preliminary injunction proceeding does not make the transaction lawful. Nevertheless, this unlawful Acquisition closed by the end of 2019, giving BMS the ability to sit on a Joint Steering Committee of its only future direct competitor—Nimbus's allosteric Tyk2 inhibitor—and exercise the Warrant to acquire it in the future.

9.     For a year and half, Nimbus has been working under the chilling effect of its main competitor holding a warrant to buy its allosteric Tyk2 asset.  Now, BMS, through Celgene, has given Nimbus notice of its intent to exercise the Warrant and has put Nimbus further into a regulatory and business purgatory; and it has demanded access to review all of Nimbus's Tyk2

Confidential Information as part of the Warrant mechanism, and is in a position to use that essential Confidential Information in ways that will harm competition and Nimbus.  If not stopped, BMS would complete a "killer acquisition," by dragging its future competition through another year of uncertainty during a protracted FTC review, with the ultimate goal of derailing, or killing, Nimbus's development program.

### JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337(a) (antitrust), and 15 U.S.C. § 15 (Clayton Act) because Plaintiffs assert claims for violations of the federal antitrust laws.

11.     The Court has personal jurisdiction over each defendant.  Each defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal monopolization scheme throughout the United States, including in this District. The anticompetitive scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

12.     Venue is proper in this District pursuant to 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. §1391(b) (general venue provision), because Defendants resided, transacted business, were found, or had agents in this District.  A substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have and will continue to have substantial effects in this District.  In the Warrant, the Parties agreed that the sole jurisdiction and venue for all actions, suits and proceedings of a dispute, controversy or claim between the Parties solely arising out of, or relating to, this Warrant shall be in this District.

## PARTIES

13.　　Nimbus Therapeutics, LLC is a Delaware limited liability company with its principal place of business in Massachusetts.

14.　　Nimbus Lakshmi, Inc. is a Delaware corporation with its principal place of business in Massachusetts.  Nimbus Lakshmi, Inc. is a wholly owned subsidiary of Nimbus Therapeutics, LLC.

15.　　Celgene Corporation is a Delaware corporation with its principal place of business in New Jersey.  Celgene is a wholly owned subsidiary of Bristol-Myers Squibb Company.

16.　　Bristol-Myers Squibb Company is a Delaware corporation with its principal place of business in New York.  On November 20, 2019, BMS completed its acquisition of Celgene.

## FACTUAL ALLEGATIONS

### Nimbus Innovates To Provide New Tyk2
### Therapeutics for Autoimmune and Inflammatory Diseases

17.　　Nimbus is a biotechnology company that designs breakthrough medicines through structure-based drug discovery and development.  Nimbus designs potent and selective small molecule compounds targeting proteins that are known to be fundamental drivers of pathology in highly prevalent human diseases and which have proven difficult for other drug makers to tackle.

18.　　Relevant here, Nimbus developed a drug candidate targeting a specific enzyme, tyrosine kinase 2 or "Tyk2," which has been shown to impact a large number of autoimmune and inflammatory diseases.  Tyk2 is an important signal-transducing enzyme that mediates immune signaling and is important in both adaptive and innate immune cells.  Human genetic studies have shown that mutations in Tyk2 that reduce enzyme activity and downstream signaling are protective in a large number of autoimmune and inflammatory diseases, including psoriasis.

Utilizing unique and innovative structure-based drug design technologies, Nimbus designed highly selective, potent allosteric inhibitors against Tyk2 with suitable pharmaceutical properties to reduce enzyme activity and downstream signaling.  The result:  potential new therapeutics in inflammatory disorders.  Nimbus initiated its Phase 2 clinical trials for its allosteric Tyk2 inhibitor as part of the regulatory approval process with the Food and Drug Administration ("FDA").

19.     Allosteric Tyk2 inhibitors by BMS and Nimbus have the potential as oral therapies for the treatment of psoriasis with similar or better safety and tolerability and markedly improved efficacy for psoriasis as compared to the leading alternative treatment Otezla (apremilast).  Otezla is the most significant oral product approved to treat moderate-to-severe psoriasis in the United States.  Older oral generic products, such as methotrexate and acitretin, do not have a competitive efficacy, safety, and side effect profile to constrain Otezla competitively for patients with moderate-to-severe psoriasis who desire an oral treatment.  Otezla and deucravacitinib compete in this market and Nimbus's future potential entry poses a competitive constraint.

20.     Currently, there are no Tyk2 inhibitors approved by the FDA or other drug approval agencies in other countries.  Nimbus and BMS have the two most advanced allosteric Tyk2 inhibitor programs in clinical trials or under FDA review.  The two products are each other's closest competitive constraint.  In addition to the broader market for oral drugs for the treatment of moderate-to-severe psoriasis, these two assets compete in the submarket for orally administered Tyk2 inhibitors for the treatment of moderate-to-severe psoriasis.  BMS's deucravacitinib is the most advanced oral treatment for moderate-to-severe psoriasis in development.  Nimbus's allosteric Tyk2 inhibitor is the only expected competitive challenger to

BMS's deucravacitinib.  If and when BMS's deucravacitinib is approved by the FDA, the only competitive pressure from another allosteric Tyk2 inhibitor it will face is the Nimbus allosteric Tyk2 inhibitor.  There are no other assets with a path to FDA approval for the next five-plus years.  BMS has completed Phase 3 clinical trials and announced its safety and efficacy results in April 2021.  Upon information and belief, BMS has submitted a new drug application with the FDA to seek final approval of deucravacitinib for distribution and marketing for the treatment of moderate-to-severe psoriasis.  BMS anticipates approval and a launch of its deucravacitinib product in early 2022.

21.     In addition to moderate-to-severe psoriasis, Tyk2 inhibitors may be effective in a number of other rheumatological conditions.  As a result, in the last ten years, there has been extensive competition in the research and development of drug candidates inhibiting Tyk2. Many companies, including well-resourced competitors like Genentech, Pfizer, and Abbvie, have spent years and extensive financial resources competing in research and development to explore how this kinase can be inhibited selectively and potently to cause a downstream cascade of biological effects in the human body with an orally administered drug that would have a therapeutic benefit while maintaining a favorable safety profile.  As others failed and abandoned their programs, Nimbus and BMS have remained as the only companies competing to innovate in allosteric Tyk2 inhibition.  The window for competition at this innovation level may be closing as BMS gets closer to having its drug approved.  Once the BMS drug is approved, the regulatory clock will start ticking for generic entry at lower prices (due to the passage of the Drug Price Competition and Patent Term Restoration Act, better known as the Hatch-Waxman Act).  As such, unless a competitor is already in Phase 2 clinical trials, which no competitor other than Nimbus is, the incentives to stay in or enter the innovation competition will diminish, and

likely will disappear, in the next few years, because the timeline to develop a new "innovative" Tyk2 inhibitor likely will run up against generic entry.  Upon information and belief, Nimbus understands that two other small companies have stated that they have allosteric Tyk2 inhibitors in Phase 1 trials.  These programs do not currently competitively constrain BMS.

22.     Celgene previously developed and marketed apremilast under the brand name Otezla.  But, under scrutiny from the FTC, Celgene was compelled to divest Otezla in December 2019, as a condition for the FTC clearance of its acquisition by BMS.

23.     While apremilast is dominant today, allosteric Tyk2 inhibitors are expected to disrupt the markets for the treatment of not just psoriasis, but other autoimmune diseases, and eventually erode virtually all of apremilast's sales.  Many autoimmune diseases appear phenotypically similar but are molecularly heterogenous (at the group level) with respect to pathobiology.  Specifically, a given individual's disease may be primarily driven by one or more mechanisms, whereas another individual's disease may be driven by some overlapping but some unique mechanisms compared to the first.  For many autoimmune and inflammatory diseases other than psoriasis, there are no agents currently approved that address the same breadth of relevant pathobiology.  Therefore, an allosteric Tyk2 inhibitor would be expected to provide an important alternative treatment.

**The Nimbus-Celgene Alliance And The Warrant Agreement**

24.     In 2017, Nimbus and Celgene entered into the Agreement.  Under the Agreement. Nimbus and Celgene structured a procompetitive collaboration to innovate novel technology and drugs that would strive to replace standard of care drugs in numerous autoimmune indications by focusing on allosteric inhibition of Tyk2.  This collaboration was intended to, and would, directly compete with BMS's allosteric Tyk2 inhibitor program.

25.     On September 21, 2017, Nimbus and Celgene executed a Warrant to Purchase Stock which included the right to acquire all of Nimbus's Tyk2 program.  Under the terms of the Warrant, Celgene retained the right to acquire Nimbus's compounds, associated patents, data, clinical efforts, regulatory files, manufacturing procedures, etc., when Nimbus completes a Phase 1b study and the window to exercise the Warrant is open.

26.     In the event the Warrant is consummated, in addition to the consideration on the day of exercise, Nimbus continues to have a financial interest in the successful development and commercialization of the Nimbus Tyk2 asset.

27.     Recognizing the sensitive nature of the scientific information being delivered by Nimbus to Celgene under the Warrant (*e.g.*, preclinical and clinical data, pharmacokinetics, absorption, distribution, metabolism and excretion, chemical structures, polymorphs, particle size, structure-activity-relationship, formulation, intellectual property filings, patent strategy, and manufacturing), the Warrant and the broader Agreement contains strict confidentiality provisions.  Celgene is not at liberty to share information provided by Nimbus with third parties.  Similarly, the terms of the Warrant are subject to various confidentiality restrictions.

**The BMS-Celgene Acquisition Was Anticompetitive**.

28.     Two years later, in November 2019, BMS acquired Celgene for over $80 billion, thereby acquiring Celgene's option to purchase the Nimbus Tyk2 program and unraveling the competitive rigor the Nimbus-Celgene Agreement had created and fostered.  Instead, the mega-merger unlawfully combined BMS's leading allosteric Tyk2 program, deucravacitinib, with BMS's ability to monitor its only potential direct competitor—in and of itself a restraint of competition—as well as the right to acquire that competitor.

29.     Post-acquisition, Celgene no longer has any incentive to quickly develop and market products that compete directly with its parent company's leading allosteric Tyk2 inhibitor

product. Not only did Nimbus lose Celgene's support and collaboration, but the acquisition has now jeopardized the confidentiality of Nimbus's sensitive and highly competitive research data to its principal competitor, despite the Warrant's obligations to maintain the confidentiality of Nimbus's proprietary information.

30.     The Acquisition created a chilling effect on Nimbus's ability to find other procompetitive supporters for its innovations now that its top competitor retains the right to acquire its entire Tyk2 program. Worse still, the BMS-Celgene Acquisition handed BMS the ability to cause delays in Nimbus's Tyk2 program through reduced support for Nimbus and introduction of regulatory delays (including the Hart-Scott-Rodino filing and review process) at the time of Warrant exercise, and has hindered Nimbus's ability to quickly navigate the development of its program independently.

31.     When the FTC approved the BMS-Celgene Acquisition, several commissioners highlighted the very anticompetitive threat that is now unfolding. As Commissioners Chopra and Slaughter observed in their dissents, the FTC did not seek to block the transaction because the agency focused only on the product overlaps between the two large pharmaceutical companies. The agency concluded that Celgene's apremilast will face future competition from BMS's Tyk2 inhibitor, thus a divestiture of apremilast to a third party reduces the anticompetitive effects of the transaction enough to cause the Agency to accept a consent decree. However, as Commissioner Slaughter so succinctly summarized:

> The consent decree in this case follows the Commission's standard approach. It remedies a serious concern about a drug-level overlap between BMS's development-stage BMS 986165 (or "TYK2") and Celgene's on-market Otezla for the treatment of moderate-to-severe psoriasis. This is important, and I support the Commission's effort to remedy this drug-level overlap. However, I remain concerned that this analytical approach is too narrow. In particular, I believe the Commission should more broadly consider

whether any pharmaceutical merger is likely to exacerbate anticompetitive conduct by the merged firm or ***to hinder innovation***.

32.    Commissioner Chopra expressed the same concern:

This massive $74 billion merger between Bristol-Myers Squibb (NYSE: BMY) and Celgene (NASDAQ: CELG) may have significant implications for patients and inventors, so we must be especially vigilant . . . Will the merger facilitate a capital structure that magnifies incentives to engage in anticompetitive conduct or abuse of intellectual property?  ***Will the merger deter formation of biotechnology firms that fuel much of the industry's innovation?***

33.    The Commissioners' concerns were well-founded.  The reduced support for the Nimbus asset, as well as the regulatory uncertainty, has the effect of diminishing the competitive threat Nimbus poses for the BMS Tyk2 program, resulting in lack of competition in the markets for (1) oral drugs for the treatment of moderate-to-severe psoriasis, (2) a submarket for Tyk2 inhibitors for the treatment of moderate-to-severe psoriasis, and (3) the innovation market for research and development surrounding Tyk2 inhibition.  There may be other relevant markets around other indications in which a lack of innovation surrounding Tyk2 has caused, or will cause, competitive harm.

34.    Through the BMS-Celgene Acquisition, where the remedy was limited to the divesture of apremilast, Celgene has materially increased the antitrust risk surrounding the Warrant in breach of its obligation under Section 6.8 of the Warrant to "use commercially reasonable efforts to comply with, and [] refrain from taking any action that would impede compliance with, all Applicable Laws [including federal antitrust laws] . . . ."

**Exercising The Warrant Would Be Anticompetitive And In Violation Of Law.**

35.    On June 1, 2021, Celgene provided Nimbus a "Notice of Interest" to exercise the Warrant to acquire Nimbus's allosteric Tyk2 inhibitor program.  The Notice triggered a cascade of disclosure obligations for Nimbus to share its sensitive and highly competitive clinical trial

data, preclinical data, and intellectual property strategy and patents with what is now its only competitor in the market:  BMS.

36.     By exercising the Warrant, Celgene and BMS are hoping to perfect the anticompetitive benefits it derived from the BMS-Celgene Acquisition.  BMS is now able to closely monitor and control its only other competitor Tyk2 program, while retaining the power to delay, and ultimately kill, Nimbus's Tyk2 development.

**Celgene Breached Its Obligations In The Warrant.**

37.     Celgene has breached its obligations under the Warrant.  Further, the terms of the Warrant do not permit Celgene to proceed with exercising the Warrant because to do so would be in violation of law and in further breach of Celgene's covenants.  In connection with executing the Warrant, Celgene represented to Nimbus that, as of the date of signing and as of the date it would exercise its option, it was and would be in "Compliance" with the law and would not violate any law to the extent such a violation would create a material adverse effect on Celgene's ability to consummate the transaction—namely to exercise the Warrant and acquire Nimbus's Tyk2 program.  Specifically, under Section 5.3, Celgene agreed that:

> The execution and delivery of this Warrant and the other
> Transaction Agreements and the consummation of the transactions
> contemplated hereby, will not: . . . (b) violate any Applicable Law
> [including federal antitrust laws] or Court Order applicable to
> Celgene, in each case, solely to the extent that such breach or
> violation would have a material adverse impact on Celgene's
> ability to consummate the transactions contemplated hereby.

38.     Similarly, in Section 6.8(a), Celgene further covenanted to "use commercially reasonable efforts to comply with, and [] refrain from taking any action that would impede compliance with, all Applicable Laws [including federal antitrust laws] . . ."

39.     Celgene breached its obligations when it was acquired by BMS in November 2019 and failed to divest itself of the Warrant.  Without divesting itself of the option to acquire

Nimbus's allosteric Tyk2 program, BMS thus not only has their lead allosteric Tyk2, deucravacitinib, but also the right to acquire Nimbus's program, including the lead molecule and all molecules being developed as backup products in the event the lead molecule was unsuccessful.  As a result, BMS does not have the same incentives to develop Nimbus's Tyk2, as Celgene did before its acquisition by BMS, given that this would lead to the cannibalization of BMS's own Tyk2 sales.  Consequently, the combination of BMS and Celgene creates a monopoly over the only two allosteric Tyk2 inhibitor programs in the market in violation of federal antitrust laws.

40.     The BMS-Celgene Acquisition is a violation of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act because it has had the effect of reducing competition in multiple markets involving allosteric Tyk2 inhibitors.  That underlying violation materially affects Celgene's ability to consummate the closing of the Warrant.  The regulatory review of the consummation of the Warrant by Celgene or BMS has become far more challenging because this transaction is now a "killer acquisition."

41.     But for the BMS-Celgene Acquisition, Nimbus would have reasonably expected that Celgene's exercise of the Warrant would have received termination of the regulatory waiting period under the Hart-Scott-Rodino Act without much scrutiny.  Instead, the parties have received a Second Request for information from the FTC which requires a massive undertaking by Nimbus to produce documents and detailed information as well as provide witness testimony to respond to the FTC's inquiry.  As a result, Nimbus is facing potentially insurmountable regulatory and legal risk.  If the Warrant is not terminated, BMS and Celgene have the capacity under the Warrant to extend the FTC review of this transaction for more than a year.

42.     Even assuming that the BMS-Celgene Acquisition is not an independent

violation, the exercise of the Warrant here—and BMS's resulting monopolization of all Tyk2

inhibitor technologies on the market—will be a violation of Section 7 of the Clayton Act,

irrespective of whether the FTC chooses to sue to block the transaction.  Nimbus is highly

incentivized to maximize the potential of its Tyk2 asset in psoriasis and beyond.  Similarly,

Celgene was highly incentivized to develop the asset and commercialize it aggressively.  Nimbus

stood to benefit from Celgene's aggressive competitive approach against BMS because the

Warrant envisions additional future payments based on the success of the program.  By contrast,

if BMS is allowed to determine or influence the future of its key competitor, the competition

between these two Tyk2 competitors will be curbed.  Both patients and Nimbus will be injured.

43.     There is a credible threat that, unless stopped, BMS will slow down or kill the

development of Nimbus's Tyk2 asset.  First, BMS has the incentive to protect its leading Tyk2

inhibitor, deucravacitinib, from future competition.  Second, BMS has an incentive to avoid

additional payments to Nimbus.  BMS is facing similar allegations in a different action in this

District, where it is alleged that BMS "delayed the development and production of lisocabtagene

maraleucel ("Liso-cel"), a life-saving cancer therapy that treats the most common form of Non-

Hodgkin's lymphoma" in order to avoid paying additional consideration to Celgene shareholders

who had rights to an additional payment if BMS were to secure approval from the FDA for Liso-

cel within a prescribed window after the consummation of the BMS-Celgene Acquisition. Case

1:21-cv-04897 Document 1 Filed 06/03/21.

44.     The Warrant provides (in Section 10.1(c)) that Nimbus is entitled to terminate the

Warrant if Celgene breaches its representations or covenants concerning compliance with the

law.  On August 13, 2021, Nimbus sent written notice to Celgene that it is terminating the

Warrant.  Celgene's breaches are not curable because they are the result of its irreversible acquisition by BMS.  Therefore, Nimbus is entitled to terminate the Warrant as a result.

## COUNT I
## (DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201-2202)

45.     Plaintiffs incorporate the allegations of paragraphs 1 through 44 as if fully set forth herein.

46.     Pursuant to 28 U.S.C. §§ 2201-2202, this Court has authority to declare the rights and other legal relations of any interested party seeking such declaration before it and to grant any necessary or proper relief.

47.     The Warrant was entered into as a valid, binding, and enforceable agreement between Nimbus and Celgene for which there was an offer, acceptance, and adequate consideration exchanged between the parties thereto.

48.     Nimbus has fulfilled its obligations under the Warrant, including compliance with its obligations to provide highly sensitive, competitive information regarding its allosteric Tyk2 inhibitor in response to Celgene's Notice of Interest to exercise its rights under the Warrant. Moreover, Nimbus is complying with its obligations to respond and provide information to the FTC in response to Celgene's Notice of Interest and its corresponding Hart-Scott-Rodino disclosure obligations.

49.     Celgene, through its acquisition by BMS and its attempt to exercise its rights under the Warrant, has breached the representations and warranties under Article V of the Warrant.  Specifically, BMS's acquisition of Celgene without the divestment of the Warrant constitutes a violation of the United States antitrust laws under Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.

50.     Section 10.1(c) of the Warrant provides that Nimbus is entitled to terminate the Warrant if Celgene breaches its representations or covenants concerning compliance with the law.  On August 13, 2021, Nimbus sent written notice to Celgene that it terminated the Warrant.  Celgene's breaches are not curable because they are the result of its irreversible acquisition by BMS.  Therefore, Nimbus is entitled to terminate the Warrant as a result.

51.     On information and belief, Defendants contest Plaintiffs' entitlement to terminate the Warrant and their entitlement to declarations regarding the same; as a result, an actual justiciable controversy ripe for judicial determination now exists between the parties.

52.     Therefore, Nimbus respectfully requests that this Court enter declaratory judgment that Nimbus is entitled to terminate the Warrant under these circumstances.

## COUNT II
## (BREACH OF CONTRACT)

53.     Plaintiffs incorporate the allegations of paragraphs 1 through 52 as if fully set forth herein.

54.     The Warrant was entered into as a valid, binding, and enforceable agreement between Nimbus and Celgene for which there was an offer, acceptance, and adequate consideration exchanged between the parties thereto.

55.     Nimbus has fulfilled its obligations under the Warrant, including compliance with its obligations to provide highly sensitive, competitive information regarding its allosteric Tyk2 inhibitor in response to Celgene's Notice of Interest to exercise its rights under the Warrant.  Moreover, Nimbus has complied with its obligations to respond and provide information to the FTC in response to Celgene's Notice of Interest and its corresponding Hart-Scott-Rodino disclosure obligations.

56.     Celgene, through its acquisition by BMS and its attempt to exercise its rights under the Warrant, has breached the representations and warranties under Article V of the Warrant.  Specifically, BMS's acquisition of Celgene without the divestment of the Warrant constitutes a violation of the United States antitrust laws under Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.

57.     Celgene's breach has caused Nimbus needless delay in the advancement of its Tyk2 program as a result of its own anticompetitive incentive to delay Nimbus's product from competing with its parent's own allosteric Tyk2 inhibitor.  This delay and uncertainty due to Defendants' anticompetitive conduct has caused Nimbus to suffer damages and reputational harm.  The only adequate remedy for Celgene's breach is recission, termination of the Warrant, and damages for the harm caused by Defendants illegal conduct.

### COUNT III
### (VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1)

58.     Plaintiffs incorporate the allegations of paragraphs 1 through 57 as if fully set forth herein.

59.     BMS's conduct was, in the aggregate, a restraint of trade or commerce reducing competition in the relevant markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### COUNT IV
### (ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2
### OF THE SHERMAN ACT, 15 U.S.C. § 2)

60.     Plaintiffs incorporate the allegations of paragraphs 1 through 59 as if fully set forth herein.

61.     Through its acquisition of Celgene, BMS obtained the ability to adversely affect, and did adversely affect, allosteric Tyk2 inhibitor technology being developed by Nimbus causing harm in the Tyk2 submarket, as well the Tyk2 innovation market.  Specifically, BMS

engaged in the anticompetitive conduct of exercising Celgene's Warrant so that it would have control over the only two Tyk2 technologies being developed in the United States.

62.     The goal, purpose, and/or effect of BMS's scheme is to create monopoly control over Tyk2 inhibitor technology, delay the introduction of competitor products and maintain its expected monopoly profits upon launch of its allosteric Tyk2 inhibitor, deucravacitinib.

63.     If BMS does not exercise its Warrant, Nimbus will continue to develop its allosteric Tyk2 inhibitor technology and to compete with BMS's Tyk2 technology, providing therapeutic and price competition for the benefit of patients.

64.     There are no procompetitive justifications for BMS's exercise of the Warrant to control both Tyk2 inhibitor technologies.

65.     BMS's conduct was, in the aggregate, an act of attempted monopolization undertaken with the specific intent to monopolize the submarket for allosteric Tyk2 inhibitor products and the Tyk2 innovation market in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT V**
**(VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18)**

66.     Plaintiffs incorporate the allegations of paragraphs 1 through 65 as if fully set forth herein.

67.     In November 2019, BMS acquired Celgene for over $80 billion.  Through its acquisition of Celgene and its Warrant with Nimbus, BMS obtained the ability to adversely affect the competitive development of allosteric Tyk2 inhibitor technology.  The Acquisition resulted in a chilling effect on Nimbus's Tyk2 development program and the exercise of the Warrant has exacerbated the regulatory uncertainty around Nimbus's program.  The BMS-Celgene Acquisition has reduced competition in each of the relevant markets alleged.  As a

result, BMS is now positioned to delay approval for and market entry of the only competitor

product to its own allosteric Tyk2 inhibitor, deucravacitinib.

68.     In each of the relevant markets, Nimbus's competitive injury flows from the

anticompetitive effect of the BMS-Celgene Acquisition.  In fact, the anticompetitive effect in the

market stems from BMS's ability to curb Nimbus from competing aggressively and achieve

commercial success through a rapid drug approval of an allosteric Tyk2 inhibitor.

69.     Defendants' conduct in seeking to exercise the Warrant with such anticompetitive

effects has caused Nimbus damages.

70.     Even assuming arguendo that the BMS-Celgene Acquisition is not an independent

antitrust violation, the closing of the Warrant and the resulting monopoly power by BMS will be

a violation of Section 7 of the Clayton Act.  Nimbus will equally suffer from the halting of its

independent efforts to create a robust competitive product to take on the future blockbuster

deucravacitinib.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment as follows:

71.     Judgement be entered declaring Nimbus's right to terminate the Warrant, thereby

terminating the Warrant as violative of federal antitrust laws in light of the BMS-Celgene

Acquisition;

72.     Judgement be entered awarding treble damages under 15 U.S.C. § 15 for

Celgene's anticompetitive conduct that delayed Nimbus's entry into the market;

73.     Judgment be entered awarding Nimbus injunctive relief precluding Celgene from

exercising the Warrant as violative of federal antitrust laws;

74.     Judgment be entered awarding Nimbus their attorneys' fees and costs,

disbursements, and pre- and post-judgment interest; and

75.     Judgment be entered awarding Nimbus such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. Civ. P. 38, Nimbus hereby demands a trial by jury on all issues so triable.

Dated:  August 13, 2021                              Respectfully submitted,

By:  /s/ *Arman Oruc*
Arman Oruc
*AOruc@goodwinlaw.com*
Goodwin Procter LLP
601 S. Figueroa Street
Suite 4100
Los Angeles, CA 90017-5704
Phone: (213) 426-2500
Fax: (213) 623-1673

Jeffrey A. Simes
*JSimes@goodwinlaw.com*
Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018-1405
Phone: (212) 813-8800
Fax: (212) 355-3333

Andrew M. Lacy
*ALacy@goodwinlaw.com*
Goodwin Procter LLP
1900 N St. NW
Washington, DC 20036-1612
Phone: (202) 346-4182
Fax: (202) 204-7254

Alicia Rubio-Spring (*Pro Hac Vice application forthcoming*)
*ARubio-Spring@goodwinlaw.com*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: (617) 570-1000
Fax: (617) 523-1231

*Attorneys for Plaintiffs Nimbus Therapeutics, LLC and Nimbus Lakshmi, Inc.*