**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NIMBUS THERAPEUTICS, LLC and NIMBUS LAKSHMI, INC., | |
| Plaintiffs and Counter-defendants, | |
| v. | 21-cv-6850 (JSR) |
| | HON. JED S. RAKOFF |
| CELGENE CORPORATION and BRISTOL-MYERS SQUIBB COMPANY, | |
| Defendants and Counter-claimants. | |

**STIPULATION AND [PROPOSED] ORDER REGARDING THE PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION**

Plaintiffs Nimbus Therapeutics, LLC and Nimbus Lakshmi, Inc. (collectively "Plaintiffs" or "Nimbus") and defendants Celgene Corporation and Bristol-Myers Squibb Company (collectively "Defendants" or "BMS-Celgene") (Plaintiffs and Defendants collectively, the "Parties") are parties to the above-captioned action (the "Action"). The parties intend that this Order will govern discovery of documents and electronically stored information ("ESI") in this case as a supplement to the Federal Rules of Civil Procedure, the Local Civil Rules for the Southern District of New York, and/or any other applicable orders and rules. The failure of this Stipulation to address any particular issue is without prejudice to any position that a party may take on that issue.

It is hereby stipulated by and between the parties, through their respective counsel, as follows:

1

# I.     DEFINITIONS

A.      "Action" means the above-captioned matter, and any and all cases consolidated or coordinated with it.

B.      "Custodian" means the individual or originating source from which Documents or ESI will be collected and reviewed.

C.      "Document" and "Electronically Stored Information" ("ESI") shall have the same meaning as the usage of these terms in Civil Rule 26.3(c)(2) of the Local District Rules and Federal Rule of Civil Procedure 34(a)(1)(A).

D.      "Email" means an electronic means for sending, receiving, and managing communications via different structured data applications (email client software), including, but not limited to, Microsoft Outlook, Google Gmail, Yahoo Mail, or Lotus Notes, and the file created or received by such means, though the inclusion of any platform, program, client, or software as an example herein will not obligate any Party to collect such ESI.

E.      "Extracted Text" means the text extracted from a native document, and includes all header, footer, and document body information, including any hidden content, when available.  A "Text File" is a file containing the full multi-page text of native or near-native files extracted directly from the native file, or, in the case of Paper/hard copy Documents subject to OCR, a file containing the text resulting from the OCR.

F.       "Load File" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachments, and where each document begins and ends.  A Load

File will also contain data relevant to the individual Documents, including extracted and user-created Metadata, as well as OCR or Extracted Text, should such data be available.

G.      "Media" means an object or device, including but not limited to, a disc, tape, computer, or other device, on which data is or was stored.

H.      "Metadata" means (i) information associated with or about a file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, or usage or validity of the electronic file; and (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, saved, or otherwise manipulated by a user of such system.

I.      "Native Format" means and refers to the file structure of a document created by the original creating application (in contrast to a Static Image, which is a representation of ESI produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems, such as .tiff or .pdf).

J.       "OCR" means optical character recognition technology that is created by software used in conjunction with a scanner that is capable of reading text-based Paper/hard copy Documents and making such documents searchable using appropriate software.

K.       "Parties" collectively shall mean all named parties to any action in these Proceedings, including any Party added or joined to any complaint in these Proceedings, as well as named parties to actions that may be consolidated into or coordinated with the Action.

L.     "Paper Documents" and "hard copy documents" shall mean and include all documents that are maintained by a Party to the Action in paper (or other non-electronic) form in the usual course of its business and in its regularly conducted activities.

M.     "Production" or "Produced" includes any exchange of Documents or ESI between the Parties, whether voluntarily or in response to a formal or informal request.

N.     "Producing Party" means or refers to a Party in the above-captioned matter from which production of Documents or ESI is sought.

O.     "Requesting Party" means or refers to a Party in the above-captioned matter seeking production of Documents or ESI.

P.     "Search Term" means a combination of words (including synonyms) and phrases designed to capture potentially relevant ESI, and includes strings of words and phrases joined by proximity and Boolean connectors.

Q.     "Static Image" means or refers to a representation of ESI produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems.  A Tagged Image File Format (TIFF) image is an example of a Static Image.  "TIFF" refers to the CCITT Group IV graphic file format for storing bit-mapped images of ESI or Paper Documents.

R.     "Structured Data" means ESI stored in a structured format, such as databases or data sets according to specific form and content rules as defined by each field of the database.

S.     "Unstructured Data" refers to free-form data which either does not have a data structure or has a data structure not easily readable by a computer without the use of a specific

4

program designed to interpret the data, such as word processing documents, slide presentations, Email, and image files.

## II.     SCOPE FOR PRODUCTION FORMAT OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION

A.     **General**. The parties are aware of the importance of cooperation and commit to cooperate in good faith throughout the matter consistent with the ESI Guidelines to promote the "just, speedy, and inexpensive determination" of this action, as required by Fed. R. Civ. P. 1.  The parties agree to use reasonable, good faith, and proportional efforts to identify and produce relevant and discoverable information consistent with Fed. R. Civ. P. 26(b)(1).  The parties will take reasonable steps to comply with this agreed-upon Order.  Discovery measures that do not reasonably or meaningfully lead to resolutions of the claims and defenses in this matter should be avoided to reduce cost and time.  To the extent that third parties may produce documents in this case, the Parties agree to request that such third parties adopt this Agreement.  Nothing about such a request to a third party shall be intended to narrow, expand, or otherwise affect the rights of the Parties or the third party to object to any subpoena or informal document request.

The production specifications in this Order apply only to Documents produced in the first instance in this Action.  To the extent any Party is required to or agrees to produce Documents in this Action that originally were collected or produced in other related cases or pursuant to related government investigations, such Documents will be re-produced in this Action in the same format in which they originally were produced in the other cases or to the government.

B.     **Scope**. Nothing in this Order is intended to be an exhaustive list of discovery obligations.  To the extent additional obligations or rights not addressed in this Order arise under the Federal Rules of Civil Procedure, local rules, or applicable state and federal statutes, they shall

be controlling.   Except as specifically limited herein, this Order governs the production of discoverable documents by the Parties during the litigation.   In the event of transfer to other courts, this Order will remain in effect in all respects, until adopted by the transferee court or replaced by a successor agreement.   This Order shall not enlarge, reduce, or otherwise affect the scope of discovery in this litigation as imposed by the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders, nor imply that discovery produced under the terms of this Order is properly discoverable, relevant, authentic, or admissible in this or in any other litigation.   Subject to this Order, the Parties' objections and responses to requests for production of documents and interrogatories, and subject to a binding protective order, all documents that are responsive to discovery requests and not designated as privileged shall be produced in the manner provided herein.

C.    **Disputes**.   The Parties shall meet and confer in good faith on any issue regarding ESI, as necessary.   If there is a dispute concerning the scope of a Party's preservation or collection efforts, the burden is on the receiving Parties to explain their reasons, in person, in writing (including email) or by telephone, for believing that additional efforts are reasonable and proportionate.   In particular, before initiating discovery about preservation and collection, a Party shall confer with the other Party concerning the specific need for such discovery, including its relevance to claims and defenses, and the suitability of alternative means for obtaining the information.   Discovery into such matters may be compelled only on a showing of good cause.

Similarly, if a Requesting Party has good cause to believe there is a deficiency in the Producing Party's productions, the Requesting Party must raise the issue with the Producing Party, explaining the basis for its belief.   Good cause requires more than mere speculation, as a

6

Requesting Party must have some concrete evidence of a deficiency and must explain their reasons for believing additional efforts are reasonable and proportional.  The Parties will meet and confer with the goal of identifying a means by which the Producing Party can provide assurances of the reasonableness of its discovery efforts or to identify additional production criteria to cure the deficiency.

In the event the Parties cannot reach agreement after a good faith effort to resolve the dispute, the Parties shall submit the matter to the Court for determination.

D.     **Limitations and Non-Waivers**.  The Parties and their attorneys do not intend by this Order to waive their rights to any protection or privilege, including the attorney-client privilege and work product doctrine, or their rights to object to any discovery requests.  Nothing in this Order will require disclosure of materials that a Party contends are not discoverable.  Additionally, nothing in this Order will be deemed to waive or limit any Party's right to object to the production of certain documents or information, or move for an appropriate order on the ground that the sources are not reasonably accessible because of undue burden or cost or on the ground that there is good cause for the documents' production.

E.     **Reservation of Rights**. For the avoidance of doubt, the inclusion of any platform, program, application, or software in Section I as examples does not create any independent obligation or commitment to preserve or collect ESI from such platform, program, application, or software.  The parties reserve all rights to object to any demand to collect or produce ESI from any or all of the examples listed in Section I.  To the extent that documents produced pursuant to this Order cannot be rendered or viewed without the use of proprietary third-party software, the parties

shall meet and confer to minimize any expense or burden associated with the production of such documents in an acceptable format.

F.     **Modification by Agreement**. Any practice or procedure set forth herein may be varied by agreement of the parties, which will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of Documents and ESI. Before seeking Court intervention, all affected parties shall meet and confer in good faith regarding any modification.

G.     **Modification by Court Order**. Nothing in this Order waives the right of any Party to petition the Court for an Order modifying its terms upon good cause shown, provided, however, that counsel for such Party must first meet and confer with the counsel for the opposing Party and the parties shall use reasonable best efforts to negotiate an exception from or modification to this Agreement and Order prior to seeking relief from the Court.

## III.     PRESERVATION

The parties agree that they shall continue to take reasonable steps to preserve relevant Documents and ESI in accordance with their obligations under applicable law.  By preserving information for the purpose of this Action, the parties are not conceding that such material is discoverable.

The Parties agree that the circumstances of this case do not warrant the preservation, collection, review, or production of the following sources of ESI because they are either not reasonably accessible or unlikely to contain additional relevant information, such that the associated burden and costs of preservation, collection, review, or production outweigh any benefit:

8

a. Data maintained or duplicated in any electronic backup system for the purpose of system recovery or information restoration.

b. Deleted, shadowed, damaged, residual, slack, fragmented, or other data only accessible by forensics and "unallocated" space on hard drives.

c. Data stored in random access memory ("RAM"), temporary files, or other ephemeral data that is difficult to preserve without disabling operating systems.

d. On-line access data such as temporary internet files, history, cache files, cookies, and the like, wherever located.

e. Data stored on photocopiers, scanners and fax machines.

f. Metadata fields that are frequently updated automatically, such as last-opened dates.

g. Instant messages such as messages sent on Lync Online, Microsoft Communicator, Skype, or any other instant message platform.

h. Server, system or network logs.

i. Logs of calls made from cellular or landline phones.

j. Legacy data or data remaining from systems no longer in use that is unintelligible on the systems in use.

k. Computer programs, operating systems, computer activity logs, programming notes or instructions, batch files, system files, and miscellaneous files or file fragments.

l. Other forms of ESI whose preservation requires extraordinary affirmative measures that are not utilized in the ordinary course of business.

m. All electronic data stored on mobile devices or tablets that the Producing Party believes, after interviews, does not contain relevant or responsive information.

n. Text messages and chats including but not limited to texts, iMessages and other messaging applications such as WhatsApp and WeChat.

o. Protected Material that is currently located in a foreign jurisdiction that maintains a data protection regime that impedes the cross-border transfer of personal information that is not proportional to the claims or defenses of this matter.

p.    File types on the National Institute of Standards and Technology (NIST) database of software applications, executable files, system and program files as defined by the NIST library, and files in the C:\Windows directory (e.g., LOG, DAT, etc. files).

## IV.    IDENTIFICATION OF ESI

The Parties may identify ESI:  (a) by identifying and selecting custodians most likely to possess relevant documents; and (b) by applying agreed upon search terms to identifiable data repositories and custodian data sources. The Parties agree to search for and produce unique, responsive documents from custodial data sources and data repositories within a Party's possession, custody, or control to the extent a custodian or information technology professional reveals that such locations may contain responsive information.

The Parties shall meet and confer to discuss the use of reasonable search terms and a date range as a means to identify relevant ESI for review and production, with an expectation that the Parties will reach an agreement on search terms and a date range.  Nothing in this paragraph shall operate to limit a Party's obligations under the Federal Rules of Civil Procedure and applicable decisional authority.  The Parties may cull or filter "spam" email with common commercial domain names.

The mere fact that a document is hit or captured by the application of any agreed upon search terms does not mean that such document is necessarily responsive to any propounded discovery request or is otherwise relevant to this litigation.  The Producing Party shall make determinations of discoverability, responsiveness and privilege.

If the Parties cannot resolve any dispute regarding this section, consistent with The Sedona Conference Principles, Principle 6, the responding party is best suited to evaluate the procedures,

methodologies, and technologies appropriate for preserving and producing their own electronically stored information.

## V.       PRODUCTION OF STRUCTURED DATA

In instances in which electronically stored information in a commercial or proprietary database format can be produced in an already existing and reasonably available report form or record, the Parties must produce the information in such report form or record.  If an existing report form or record is not reasonably available, then the Parties shall meet and confer regarding the content and format of a data extraction from such structured data source. The parties shall discuss and attempt to agree upon the sets of data or fields to be included in the extraction and the format in which such data shall be produced, and will reasonably exchange technical information with respect to Structured Data as is necessary to facilitate such meet and confers, including, for example, identification of available fields, available data dictionaries, mapping documents, time period for which data is reasonably available, and other information to allow the Requesting Party to understand the data systems or applications, including sample reports or extracts of Structured Data prior to its final production.  The parties reserve all rights to object, including but not limited to, objections for relevance, undue burden, and/or inaccessibility.

## VI.      IDENTIFICATION OF RESPONSIVE DOCUMENTS

The parties recognize that there exist a variety of search tools and methodologies, including but not limited to the use of search terms and technology assisted review ("TAR") tools.  The parties agree to meet and confer over the use of search tools and methodologies, including the use of specific search terms, before any particular term or methodology is applied.  To the extent a party wishes to use technology-assisted review ("TAR") to exclude non-responsive documents

from review or production, the parties agree to meet and confer before any such TAR tool is applied for that purpose. During such discussions, the Producing Party shall retain the presumptive right and responsibility to manage and control searches of its data files, including the right to use an advanced search methodology or technology-assisted review platform and to propose revisions to such methodologies in order to make them more accurate and cost-effective. The Producing Party will reasonably exchange technical information with respect to the search methods it intends to use and disclose any revisions to such methods to the Requesting Party.

The fact that a Document or ESI is identified by use of a search term or identified as potentially responsive by any other technology used to identify potentially responsive Documents and ESI shall not prevent any Party from withholding such file from production on the grounds that the file is not responsive or that it is protected from disclosure by applicable privilege or work-product protection.

## VII.   PRODUCTION OF DOCUMENTS ORIGINATING AS PAPER

The following production specifications apply to Paper Documents – those that existed in paper format prior to production (also known as "hard copy documents"). Paper Documents that originated as paper but were scanned and maintained electronically by a Party prior to inception of this Action shall be produced in accordance with Part VII of this Protocol. The parties agree to produce hard copy documents as TIFFs. Documents should be produced as single-page, black and white, group IV TIFFs imaged at 300 dpi. Bates numbers, confidentiality designations (in accordance with the Confidentiality Order to be entered by the Court and any further protective

orders governing the case), and redactions (to the extent they are necessary) should be burned into the image.  TIFF image files should be provided in an "Images" folder.

A.    **Unitizing Documents**. In scanning Paper Documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records *(i.e.,* Paper Documents should be logically unitized).  For example, documents stored in a binder, folder, or similar container (each a "container") should be produced in the same order as they appear in the container.  The front cover of the container should be produced immediately before the first document in the container.   The back cover of the container should be produced immediately after the last document in the container.  The Parties will undertake reasonable efforts to, or have their vendors, logically unitize documents correctly, and will commit to address situations of improperly unitized documents.

B.    **OCR**. To the extent that Paper Documents have been run through optical character recognition ("OCR") software, the full text shall be provided on a document-level in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document.  Text files should be provided in a "Text" folder.  To the extent in which a document is redacted, the text files should not contain the text of the redacted portions.

C.    **Unique IDs**. Each TIFF image should have a unique filename, which corresponds to the Bates number of that page.  The filename should not contain any blank spaces and should be zero-padded *(e.g.,* ABC-00000001), taking into consideration the estimated number of pages to be produced.  If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production or as soon as

13

practicable thereafter.  Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a Party produces in the Action.

        D.    **Data Load Files**. Documents should be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

        1.    Field Separator: ASCII character 20 ("¶");

        2.    Quote: ASCII character 254 ("þ"); and

        3.    New Line: ASCII character 174 ("®").

Concordance-compatible image and data load files should be provided in a "Data" folder.

        E.    **Metadata**. Each of the Metadata and coding fields set forth in Appendix A shall be produced for that Document to the extent reasonably available.  A Producing Party shall provide written notice to a Receiving Party at the time of production of any Metadata or coding fields set forth in Appendix A that are not reasonably available.

        F.    **Color**. Documents containing color need not be produced in color in the first instance, provided, however, that the Producing Party shall retain a copy of produced Paper Documents in color.  However, if good cause exists for the Requesting Party to request production of certain documents in color, the Requesting Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be produced in color format; and (2) an explanation of the need for production in color format.  The Producing Party shall not unreasonably deny such requests.

## VIII.   PRODUCTION FORMAT FOR UNSTRUCTURED ELECTRONICALLY STORED INFORMATION

The parties agree to produce in the formats described below.  These formats are deemed productions in reasonably usable form.  If any Party contends that particular Documents or ESI

warrant a different format, the parties will meet and confer to determine a mutually acceptable production format for such Documents.

A.      **TIFFs**. Documents should be produced as single-page, black and white, group IV TIFFs imaged at 300 dpi.  The document's original orientation should be maintained *(i.e.,* portrait-to-portrait and landscape-to-landscape).  Bates numbers, confidentiality designations (in accordance with the protective order governing the case), and redactions (to the extent they are necessary) should be burned into the image.  TIFF image files should be provided in an "Images" folder.

B.      **Extracted Text Files**. The full text of native files should be extracted directly from the native file (not OCR) and should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document.  Text files should be provided in a "Text" folder.  To the extent that a document is redacted, the document should undergo OCR after the text has been redacted in order to remove the redacted text.

C.      **Unique IDs**. Each image should have a unique filename, which corresponds to the Bates number of that page.  The filename should not contain any blank spaces and should be zero-padded *(e.g.,* ABC-00000001), taking into consideration the estimated number of pages to be produced.  If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production or as soon thereafter as practicable.  Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a party produces in this Action.

D.      **Parent-Child Relationships**. The parties agree that if any part of an Email or its attachments is responsive, the entire Email and attachments may be produced, except any

attachments that must be withheld or redacted based on privilege or work-product protection. When producing responsive attachments, the parent email will be produced, regardless of responsiveness, unless otherwise protected from disclosure. The parties shall take reasonable steps to ensure that parent-child relationships within a document family (the association between an attachment and its parent document) are preserved, including any attachments to emails subsumed within an email thread. The child-document should be consecutively produced immediately after the parent-document. Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family.

  E. **Metadata**. The parties agree that Metadata will be produced for all ESI, whether produced in Native Format or Static Image formats, where such Metadata exists. Appendix A sets forth the minimum metadata fields that must be produced to the extent that metadata exists for a particular document. Nothing herein shall require any Party to create or produce Metadata that does not exist or is not reasonably accessible. The parties acknowledge that the Metadata will be produced as it exists and reserve all rights with respect to the information contained therein.

F.     **Production of Documents in Native Format**.

1.     The processed native for all spreadsheets *(i.e.,* MS Excel, .CSV, or similar), PowerPoint presentations, and electronic information containing audio or video components should be produced and linked to the database by the metadata field "NativeLink."

2.     Where native files are produced in lieu of TIFF images, each native file will be assigned a unique Bates number.  The Producing Party will produce a placeholder (a single-page TIFF slip sheet indicating that the native item was produced) along with the file itself in Native Format.  The placeholder will be branded with the production number in the lower right-hand corner and the phrase "PRODUCED IN NATIVE ONLY" branded in the center of the page. The Producing Party will also brand any confidentiality or similar endorsements in the lower left-hand corner of the placeholder.

3.     To the extent that a native spreadsheet must be redacted, the Producing Party may redact metadata and either redact the native file or produce TIFF images with burned in redactions in lieu of a Native File and TIFF placeholder image.  If redacting TIFF images and to the extent that any of the following can be automated, the Producing Party, or its e-discovery vendor, should make reasonable efforts to: (1) reveal hidden rows, columns, or sheets prior to converting the document to TIFF; (2) clear any filters that may conceal information; (3) adjust column widths so that numbers do not appear as "########"; (4) ensure that column and row headings print; (5) ensure that the tab name appears in the header or footer of the document; (6) process comments so that they are produced at the end of the spreadsheet; and (7) process spreadsheets so that they print across, then down.  If good cause exists, the Requesting Party may ask the Producing Party to manually undertake the foregoing for certain documents identified by

Bates number by the Requesting Party to the extent the document was originally produced with concealed information. The Producing Party shall not unreasonably deny such a request.

        4.    **Request for Native Files**. Other than as specifically set forth above, a Producing Party need not produce documents in Native Format.  If good cause exists for the Requesting Party to request production of certain documents in Native Format, the Requesting Party may request production in Native Format by providing (1) a list of the Bates numbers of documents it requests to be produced in Native Format; and (2) an explanation of the need for reviewing such documents in Native Format.  The Producing Party shall not unreasonably deny such requests.  If good cause exists, the Producing Party shall produce an overlay to ensure that the "NativeLink" entry in the data load file indicates the relative file path to each Native File in such production, and all Extracted Text and applicable metadata fields.

        G.    **Track Changes and Comments**. To the extent that a Document or ESI was last saved with comments or changes tracked, the Document or ESI shall be imaged showing tracked changes and comments.

        H.    **Password Protected Files**. The parties will make reasonable efforts to ensure that all encrypted or password-protected Documents and ESI are successfully processed for review and production.  To the extent encrypted or password-protected Documents are successfully processed, the parties have no duty to identify further the prior encrypted status of such Documents.  To the extent security protection for such Documents and ESI cannot be successfully processed despite reasonable efforts, the Producing Party shall notify the Requesting Party about such documents prior to production and the parties shall meet and confer in good faith regarding reasonable efforts

or mechanisms to remove such encryption or password protection with respect to the production of available Metadata.

      I.    **Embedded Documents**. A producing party may exclude non-substantive embedded files (e.g., company logos, signature blocks) from production. Substantive embedded files (e.g., word or PDF documents embedded in excel spreadsheets) in responsive documents shall be extracted during processing and produced as separate documents. The Bates number of the source file from which the embedded file is extracted shall be provided as metadata associated with the embedded file, as described in Appendix A.

      J.    **Data Load Files**. Documents should be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

      1.    Text Delimiter AKA "Quote"– "þ", Hex (FE), Unicode (U+00FE), Decimal (254) 2;

      2.    Field Separator AKA "Comma "–", Hex (14), ASCII character 20 ("¶");

      3.    Unicode (U+0014), Decimal (20);

      4.    Quote: ASCII character 254 ("þ"); and

      5.    New Line: ASCII character 174 ("®").

All rows will contain the same number of delimiters and fields. The multi-value field delimiter must be consistent across all fields. For example, if the CC field contains semicolons between Email addresses, the Tag field should also contain semi-colons. Concordance-compatible image and data load files should be provided in a "Data" folder. Parties have the option to exchange sample load files. If this exchange occurs, the Requesting Party will have 14 days to

respond with Load File change requests.  Nothing in this Order will limit the parties from discussing Load File changes throughout the course of the Action.

K.     **Deduplication.** A Producing Party may globally deduplicate by exact duplicate families (within a Custodian's files or across Custodians' data) provided that (i) only exact hash duplicates are subject to deduplication; (ii) the Producing Party identifies the additional Custodians in an AllCustodian metadata field; and (iii) an Email that includes content in the BCC or other blind copy fields shall not be treated as a duplicate of an Email that does not include content in the BCC or other blind copy field, even if all remaining content in the email is identical.  Any party opting to deduplicate in a different manner from the foregoing procedure or opting not to deduplicate at all shall disclose this to the Requesting Party prior to deduplication; if deduplicating in a different manner from the foregoing procedure, that party shall also disclose their deduplication methodology to the Requesting Party prior to deduplication.  If the Requesting Party objects to the methodology, it shall timely raise those concerns with the Producing Party.

M.     **Email Threading.** Email threads are email communications that contain prior or lesser-included email communications that also may exist separately in the Party's electronic document collection.  A most-inclusive email is one that contains unique content and all of the lesser-included emails, including attachments, for that branch of the email thread.  Each Party may, at its own election, produce only the most-inclusive email threads and any attachments or other non-attachment documents not successfully analyzed by the email threading software for any reason (e.g., file size) to satisfy its production obligations.  Regardless of whether a Party elects to utilize thread suppression, each Party may list on any required privilege log only the most inclusive email threads and any attachments or other non-attachment documents not successfully analyzed

by the email threading software.  Additionally, if a Party chooses to produce only the most inclusive email threads, less-inclusive, non-privileged emails that contain no unique content, but are part of a privileged thread shall be produced.  That is, the Party will either (1) redact only the topmost, privilege portion of an email thread, or (2) will produce the less-inclusive portions of the thread separately.

N.     **Production of Transcripts**. If deposition or other transcripts are responsive, the parties shall meet and confer to determine a mutually agreeable format for producing the transcripts.

O.     **Custodian or Originating Source**. The Custodian shall be identified in the Custodian field of the database load files.  Documents found in the possession of a natural person (or on a natural person's hardware or storage media) should be produced in such fashion as to identify the natural person.  Documents found in the possession of a department, group, entity, or other common facility *(e.g.,* office, file room, archive, network storage, file share, back-up, hard drive, etc.) should be produced in such a fashion as to identify the department, group, entity, or facility.  A Producing Party shall use a uniform description of a particular Custodian across productions.

P.     **Color**. Documents not produced in native format containing color need not be produced in color in the first instance unless the color is necessary to understand the meaning or content of the document.  Additionally, if good cause exists for the Requesting Party to request production of certain documents in color, the Requesting Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be

21

produced in color format; and (2) an explanation of the need for production in color format.  The Producing Party shall not unreasonably deny such requests.

Q.     **Foreign Language**. Foreign language text files and Metadata should be delivered with the correct encoding to enable the preservation of the document's original language.

R.     **Time Zone**. Each Party's ESI should be processed and produced using a consistent Time Zone for all data.  The Party shall share the Time Zone selected for processing of its data with the other Party.

S.     **Date Format**.

1.     If a time is not available, such as the estimate date for a coded document, then 12:00 am, or 00:00 should be assigned, *i.e.,* 12/21/1999 00:00.

2.     Date delimiters, such as slashes and colons, must be consistent across all fields.   In the format of MM/DD/YYYY, there are no spaces and only forward slashes.

3.     Date formats must be consistent within any one field.

4.     Date formats must be consistent across all fields, *i.e.,* a record with a sent date should have the same format in the last modified date field.

Unless otherwise specified by a Producing Party, the Producing Parties shall make reasonable efforts to process all ESI using Eastern Standard Time ("EST") or Universal Time Coordinate ("UTC").  For the avoidance of doubt, no party will be required to reprocess any ESI that has been processed prior to the date of this order for purposes of complying with this provision.  To the extent a Producing Party cannot process ESI with these time zones, it shall disclose the same and the parties shall meet and confer regarding a reasonable alternative.

22

T. **Production Media**. The producing Party shall produce documents on readily accessible, computer or electronic Media as the Parties may hereafter agree upon, including CD-ROM, DVD, external hard drive (with standard PC compatible interface or access to a secure Online Repository agreed upon by the Parties) or via secure FTP site. Productions shall be encrypted, and password protected during transfer as detailed below. Each piece of Production Media shall be assigned a production number or other unique identifying label corresponding to the date of the production of documents on the Production Media as well as the sequence of the material in that production. The producing Party shall accompany all document productions with a transmittal cover letter or email identifying by Bates Number the documents produced.

U. **Naming Convention for Production Media**. Whether produced via secure FTP, file share, or physical media, the files produced should be combined into a compressed file such as .zip, .rar, etc. The compressed file should be named so as to indicate Producing Party, the date of the production, and the sequence of the production *(e.g.,* "Celgene Production 202120110-001"). If the production is made using physical media, the media should be labeled to include (a) text referencing that it was produced in *Nimbus Therapeutics, LLC and Nimbus Lakshmi, Inc. v. Celgene Corporation and Bristol-Myers Squibb Company;* and (b) the Bates number range of the materials contained on the media.

V. **Replacement Productions**. Any replacement production will be transmitted with a cover letter or email to identify the production as a replacement and cross-reference the BegBates and EndBates of the documents being replaced. If the replacement production is being transmitted by physical media, the media shall include the phrase "Replacement Production."

W.     **Encrypted Data**.  To maximize the security of information in transit, the producing Party must encrypt any Media on which documents or electronic files are produced.  In such cases, the producing Party shall transmit the encryption key or password to the requesting Party, under separate cover, contemporaneously with sending the encrypted Media.

## IX.   ASSERTIONS OF PRIVILEGE

A.     Pursuant to Federal Rule of Evidence 502(d), the production of privileged or work-product protected documents, ESI or information, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding.

B.     The parties agree to exchange privilege logs containing the information called for by Local Rule 26.2 and Federal Rule of Civil Procedure 26(b)(5), except as otherwise provided in Paragraphs VII(b)-(e) below.  The parties may at their own discretion opt to provide a categorical or group privilege log in lieu of a traditional document-by-document or communication-by-communication privilege log, as set forth in Local Rule 26.2(c), without prejudice to the objection right afforded the Receiving Party in Local Rule 26.2(c).  The parties will meet and confer regarding the contents of any categorical privilege log which, at a minimum, will include: (i) Privilege Log #, (ii) document types, (iii) general subject matter(s) of the documents, (iv) a single Date Range of all documents in the category, (v) a single list of Custodians for all documents in the category, (vi) the recipients of the documents and their relationships to the Custodians to the extent not evident from the entry, (vii) Privilege Log Description, and (viii) Asserted Privilege(s), unless divulgence of such information would cause disclosure of the allegedly privileged information.

C.      Whether categorical/group or traditional, the Withholding Party's log shall be in Excel format or any other format that permits electronic sorting and searching.

D.      The parties agree that the following categories of privileged and otherwise Responsive Documents and ESI need not be included in a privilege log: (a) work product of counsel and parties concerning the Action or any related matter, (b) any internal communications within a law firm, (c) any communications regarding litigation holds or preservation, collection, or review of Documents in the Action or any litigation or related investigation matter, and (d) anything generated on or after August 13, 2021, including, but not limited to, Documents and ESI, communications, and Paper Documents.

E.      If a Party requires further information to evaluate a claim of privilege, it shall explain in writing the need for such information and identify, by Bates number or other unique identifier, each document for which it seeks this information.  Within seven (7) days of such a request, the Producing Party must either (i) provide the requested information or (ii) challenge the request.  If a Party challenges a request for further information, the parties shall meet and confer to try to reach a mutually agreeable solution within fourteen (14) days of any such challenge.  If they cannot agree within seven (7) days, the parties will jointly call the Court to resolve the dispute.

## X.      COST ALLOCATION

Pursuant to Federal Rule of Civil Procedure 26, the parties generally presume that the Producing Party bears all costs of preservation, retrieval, and production of its reasonably accessible ESI and there may be cost-sharing or cost-shifting, upon agreement of the Producing and Requesting Parties or upon proper motion and Order of the Court, as to ESI that is not reasonably accessible.

## XI.   THIRD-PARTY DOCUMENTS

A Party that issues a non-party subpoena ("Issuing Party") shall include a copy of this Protocol with the subpoena and state that the parties to the Action have requested that third-parties produce Documents in accordance with the specifications set forth herein.  The Issuing Party shall promptly notify the other Parties when it receives non-party productions, and shall provide copies of such productions to the other Parties in the format in which they were received from the third-party within five (5) days.  In the event that the format of a third-party production does not conform with the specifications set forth herein, the Parties shall meet and confer regarding the format of production to Requesting Parties.  Nothing in this Protocol is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or third-parties to object to a subpoena.

## XII.   CONFIDENTIALITY

This Order shall be subject to the Confidentiality Order to be entered by the Court, and incorporates by reference any other confidentiality and/or protective order concerning protection of confidential or otherwise sensitive information that may be entered by the Court.  Nothing in this Order shall supersede or alter any confidentiality and/or protective order entered by the Court. To the extent any provision of this Order conflicts with the provisions of the Stipulation and Order of Confidentiality to be entered by the Court, the Stipulation and Order of Confidentiality shall govern.

## XIII.   AUTHENTICATION

The parties will meet and confer regarding an authentication stipulation concerning Documents produced in this Action.

## APPENDIX A: REQUIRED METADATA FIELDS

| Field | Description | Email | Non-Email ESI | Paper/ Hard Copy |
|---|---|---|---|---|
| Bates Number Begin | Beginning page Bates number | x | x | x |
| Bates Number End | Ending page Bates number | x | x | x |
| Attachment Begin | Beginning page of attachment range. Documents that are part of Document families, *i.e.,* containing parents and attachments should receive a value. | x | x | x |
| Attachment End | Ending page of attachment range. Documents that are part of Document families, i.e., containing parents or attachments, should receive a value. | x | x | x |
| AllCustodian | Production Custodians or non-human production data sources associated with the produced document | x | x | x |
| File Name | File name of the original source ESI as stored by the Custodian. | | x | |
| File Extension | File extension of document | | x | |
| Page Count | For documents produced in TIFF form, number of pages in the document. For documents produced in native, page count will be 1 (for placeholder). | x | x | x |
| Email Subject | Subject of email | x | x | |
| Author | Author field extracted from the metadata of a non-Email Document. | | x | |
| From | Email author | x | x | |
| To | Email recipients | x | x | |
| CC | Email copyees | x | x | |
| BCC | Email blind copyees | x | x | |

| Field | Description | Email | Non-Email ESI | Paper/ Hard Copy |
|---|---|---|---|---|
| Title | Title field extracted from the metadata of a non-Email Document. | | x | |
| Date Sent | Date sent (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Time Sent | Time sent (mm/dd/yyyy hh:mm:ss format) | x | x | |
| Date Created | Date created. | | x | |
| Time Created | Time document was created. | | x | |
| DateLastModified | Last modification date (mm/dd/yyyy hh:mm:ss format). | | x | |
| TimeLastModified | Last modification time (hh:mm:ss format). | | | |
| Hash Value (MD5 or SHA-1) | Unique electronic signature of email or electronic file | x | x | |
| Production Volume | Production volume name | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Confidentiality Order. "Confidential" or "Highly Confidential," if a Document has been so designated under the Confidentiality Order; otherwise, blank. | x | x | x |
| Redacted | Descriptor for documents that have been redacted | x | x | x |
| Text Path | Path of text file | x | x | x |
| Native Path | Path of native file | | x | |

The parties agree that with respect to the above-referenced metadata fields that there is no obligation for a Producing Party to rename metadata fields as long as all fields above are accounted for (if applicable).

DATED: October 25, 2021

*/s/ Arman Oruc*
Arman Oruc
*AOruc@goodwinlaw.com*
Goodwin Procter LLP
601 S. Figueroa Street
Suite 4100
Los Angeles, CA 90017-5704
Phone: (213) 426-2500
Fax: (213) 623-1673

Jeffrey A. Simes
*JSimes@goodwinlaw.com*
Marshall H. Fishman

Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018-1405
Phone: (212) 813-8800
Fax: (212) 355-3333

Andrew M. Lacy
*ALacy@goodwinlaw.com*
Goodwin Procter LLP
1900 N St. NW
Washington, DC 20036-1612
Phone: (202) 346-4182
Fax: (202) 204-7254

Alicia Rubio-Spring (admitted *Pro Hac Vice*)
*ARubio-Spring@goodwinlaw.com*
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: (617) 570-1000
Fax: (617) 523-1231

*Counsel for Plaintiffs and Counter-defendants
Nimbus Therapeutics, LLC and Nimbus
Lakshmi, Inc.*

*/s/ Yosef J. Riemer, P.C.*
Yosef J. Riemer, P.C.
Matthew Solum, P.C.
Devora Allon, P.C.
Jeffrey Goldfine
Joseph M. Sanderson
Amal El-Bakhar
601 Lexington Avenue
New York, New York 10022
Phone: (212) 446 4800
Fax: (212) 446 4900
yriemer@kirkland.com
msolum@kirkland.com
devora.allon@kirkland.com
jeffrey.goldfine@kirkland.com
joseph.sanderson@kirkland.com
amal.elbakhar@kirkland.com

*Counsel for Defendants and Counter-
claimants Celgene Corporation and
Bristol-Myers Squibb Company*

**SO ORDERED.**

Dated: New York, New York

10/26/2021 , 2021

HON. JED S. RAKOFF
United States District Judge
Southern District of New York