UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------
| NIMBUS THERAPEUTICS, LLC and  |
| NIMBUS LAKSHMI, INC.,         |
|                               |
|      Plaintiffs &             |
|      Counter-Defendants,      |        21-cv-6850 (JSR)
|                               |
|      -v-                      |        OPINION AND ORDER
|                               |
| CELGENE CORP. and             |
| BRISTOL-MYERS SQUIBB CO.,     |
|                               |
|      Defendants &             |
|      Counter-Claimants.       |
-----------------------------
```

JED S. RAKOFF, U.S.D.J.:

Before the Court is the motion of Defendants and Counter-Claimants Celgene Corporation ("Celgene") and Bristol-Myers Squibb Company ("BMS") for a preliminary injunction. On October 14, 2021, the Court issued a short, "bottom-line" order granting Celgene and BMS's motion. That order preliminarily enjoined Plaintiffs and Counter-Defendants Nimbus Therapeutics, LLC and Nimbus Lakshmi, Inc. (collectively, "Nimbus") from selling, transferring, encumbering, or otherwise disposing of, in part or in whole, Nimbus Lakshmi or the intellectual property assets Nimbus Lakshmi holds that are associated with the allosteric Tyk2 inhibitor drug that Nimbus has developed with financing and assistance from Celgene. The order also prohibits Celgene from making any assignment of its right to purchase Nimbus Lakshmi or the intellectual property assets it holds. In this Opinion and Order, the Court sets forth its reasoning in detail for these determinations.

I.    **Factual Background**

A. **Nimbus and Celgene Create a Tyk2 Research & Development Partnership**

Nimbus Therapeutics LLC is a biotechnology company that identifies molecules which have promise to become clinically significant drugs. It then seeks to partner with large, established pharmaceutical companies to develop the molecules, run clinical trials, obtain regulatory approval, and commercialize each drug candidate. Celgene is a large pharmaceutical company with a broad portfolio of clinical drugs. Celgene became a wholly-owned subsidiary of BMS in a 2019 merger transaction.

Celgene has entered two research and development ("R&D") partnerships with Nimbus related to two different drug candidates, one of which is unrelated to this suit and turned out to be unsuccessful after Celgene provided Nimbus with $25 million in R&D funding. ECF 15 ("Counterclaims") ¶ 37.[1] Through these partnerships, Celgene provides Nimbus both financing for its R&D efforts and its expertise on research, clinical trials, and pharmaceutical commercialization.

The drugs at issue in this case are allosteric inhibitors[2] of the tyrosine kinase 2 ("Tyk2"), which is an enzyme that mediates signaling

---

[1] Unless otherwise specified, all internal quotation marks, citations, omissions, alterations, and emphases are omitted from all sources cited herein.

[2] "Allosteric" regulation of an enzyme refers to the biochemical process of increasing or inhibiting an enzyme's activity through the binding of an effector molecule at a specific site on the enzyme other than the active site, which is the location on the enzyme where a substrate binds so the enzyme can trigger a chemical reaction.

in immune cells. Genetic studies have shown that reduction in Tyk2 activity reduces downstream immune signaling in a manner that can be protective in certain autoimmune and inflammatory diseases. ECF 1 ("Compl.") ¶ 18. Allosteric Tyk2 inhibitors therefore have promise as treatments for various rheumatological conditions including moderate-to-severe psoriasis, and they may be effective against other autoimmune conditions such as lupus and irritable bowel syndrome. Id. ¶ 2. Neither the Food and Drug Administration nor any other drug regulator has yet approved a Tyk2 inhibitor. Id. ¶¶ 18-23. Celgene previously owned the dominant oral treatment for moderate-to-severe psoriasis, Otezla (generic name, apremilast), which was launched in 2014. Id. ¶ 3. Once commercialized, allosteric Tyk2 inhibitors are expected to "erode virtually all of apremilast's sales." Id. ¶ 23.

In 2015, BMS began developing a new allosteric Tyk2 drug, deucravacitinib, and in April 2021 BMS announced that deucravacitinib had successfully completed phase 3 clinical trials. Id. ¶ 20. While other pharmaceutical companies had Tyk2 R&D programs, no companies other than BMS and Nimbus are expected to commercialize a competitive allosteric Tyk2 inhibitor, because the time to generic competition (and therefore reduced profits) will begin running once deucravacitinib is approved for use. Id. ¶ 21.

---

"Allosteric," OED Online, (June 2019), https://www.oed.com/view/Entry/5426.

Celgene responded in 2017 to the threat of competition to apremilast by entering the Tyk2 R&D partnership with Nimbus to develop a Tyk2 inhibitor to compete with BMS's deucravacitinib. Id. ¶¶ 2-4. Celgene ultimately made two payments totaling almost $55 million to finance Nimbus's Tyk2 R&D: a $39.9 million upfront payment and a $15 million payment made in December 2019 following the FDA's acceptance of an Investigational New Drug Application submitted by Nimbus. Declaration of Elizabeth Mily ("Mily Decl.") ¶ 8, ECF 18; Ex. 1 to Mily Decl. ¶ 2.1(a) ("Warrant"). This collaboration was controlled by a Joint Steering Committee, the rules of which allegedly provide for Nimbus to retain ultimate control over the Tyk2 R&D program. Counterclaims ¶ 49.

### a. **The Warrant**

The Nimbus-Celgene collaboration is governed by several interlocking contracts. The crucial contract for the present dispute is the Warrant, which took effect on September 21, 2017, governs the financial relationship between the companies, and provides for Celgene's option to acquire the Tyk2 assets. Specifically, the Warrant provides Celgene with the right to acquire the equity of the special purpose vehicle created to hold the intellectual property associated with the Tyk2 assets, plaintiff Nimbus Lakshmi. Mily Decl. ¶ 5. This purchase would be effected by Celgene purchasing 100% of Nimbus Lakshmi's Series B voting shares for $400 million after the earlier

of (1) Nimbus completing its first Phase 1B clinical trial[3] or (2) the sixth anniversary of the Warrant's issuance. Id. ¶ 9; Warrant §§ 1.1, 2.2(a)). Nimbus completed Phase 1B clinical trials on May 4, 2021 and sent Celgene a "Warrant Trigger Data Package" that same day containing data including the Phase 1B trial results, as contractually required. Counterclaims ¶¶ 75-77. This action triggered the following set of deadlines under the Warrant, as alleged by Celgene and BMS: Id. ¶ 78.

- June 1, 2021: Celgene to deliver Notice of Interest
- June 24, 2021: Numbus to deliver Financial and Diligence Packages
- August 27, 2021: Diligence period ends
- September 3, 2021: Nimbus delivers Update and Tender Package
- October 11, 2021: Review Period ends and Celgene must deliver notice of exercise
- February 11, 2022: Termination Date & Deadline for closing Transaction.

The Warrant (and federal antitrust law) prohibits Celgene from closing on an acquisition of Nimbus Lakshmi unless the FTC has cleared the transaction under the HSR Act or allowed the HSR Act's waiting period to expire following the parties' satisfaction of the Second Request. Opp. 4; Warrant § 8.1(c). While parties seeking HSR Act approval have an incentive to quickly comply with a Second Request if they want to consummate the proposed transaction, neither the HSR Act nor the FTC sets a deadline for compliance. Nimbus avers that under the Warrant, if all closing conditions other than HSR Act approval or expiration of the HSR Act waiting period have been satisfied by the

---

[3] "Phase 1B clinical trials are human clinical trials of a drug aimed at determining the safety and tolerability of the drug following repeat dosing in patients." Counterclaims ¶ 74.

Termination Date (120 days after Celgene provides a written notice of exercise), then Celgene may unilaterally extend the Termination Date for an additional 360 days, to October 6, 2022. Opp. 5; Warrant § 10.1(e).

The Warrant generally prohibits nonconsensual assignment of rights and obligations. Mily Decl. ¶ 13; Warrant § 11.2(a). But Celgene may unilaterally assign its rights to "a Third Party in the pharmaceutical industry with financial resources and capabilities greater than or substantially similar to those of Celgene" when "a Governmental Authority shall have issued a [Hart-Scott-Rodino Act (HSR Act) Second Request to either Nimbus or Celgene] in connection with this Warrant." Id. ¶ 15; Warrant § 11.2(a)(iii)(z). Celgene and BMS allege that during the 2017 negotiations over the Warrant, Nimbus initially rejected Celgene's proposed assignment clause that provided it with the unilateral right to assign its Warrant rights following a Second Request; but Celgene ultimately prevailed on this point, and the assignment right was included as a hedge against the risk that the Celgene's acquisition of the Tyk2 assets would draw antitrust scrutiny. Counterclaims ¶¶ 34-36.

Article X provides for the parties to terminate the Warrant. In general, Celgene can unilaterally terminate the Warrant at any time (or let it expire without exercise). Warrant § 10.1(a). The parties may also terminate the Warrant on mutual written consent. Warrant § 10.1(b). The Warrants also terminates if a court or governmental authority issues a ruling or order that permanently prohibits the

transaction from closing. Id. § 10.1(d). Finally, Nimbus may

unilaterally terminate the Warrant:

> upon a material breach of any representation, warranty, covenant,
> or agreement on the part of Celgene set forth in this Warrant ...
> or if any representation or warranty of Celgene shall have become
> materially untrue, in either case such that the conditions set
> forth in [the closing conditions] would not be satisfied as of
> the time of such breach or as of the time such representation or
> warranty shall have become untrue.

Id. § 10.1(c). However, "if such inaccuracy in Celgene's

representations and warranties or breach by Celgene is curable by

Celgene prior to the Warrant Expiration Date through the exercise of

reasonable efforts, then the Company may not terminate this Warrant ...

prior to 30 days following the receipt of written notice from the

Company to Celgene of such breach," during which time Celgene may

attempt to cure the alleged breach. Id.

Among the warranties and covenants to which Celgene agreed is a

commitment to comply with applicable law:

> The execution and delivery of this Warrant and the other
> Transaction Agreements and the consummation of the transactions
> contemplated hereby, will not ... (b) violate any Applicable Law
> or Court Order applicable to Celgene, in each case, solely to the
> extent that such breach or violation would have a material adverse
> impact on Celgene's ability to consummate the transactions
> contemplated hereby.

Id. § 5.2(b). Nimbus and Celgene further covenanted to "coordinate and

cooperate with one another and shall each use commercially reasonable

efforts to comply with, and shall each refrain from taking any action

that would impede compliance with, all Applicable Laws." Id. § 6.8(a).

The Warrant provides that "'Applicable Law' shall mean any applicable

federal, state, local or foreign law (including common law), statute,

ordinance, rule, regulation or Court Order." Id. § 1.1. Nimbus argues that the obligation to comply with "Applicable Law" therefore includes the duty to comply with federal antitrust laws, Compl. ¶¶ 37-39, which Celgene and BMS do not dispute.

B. **BMS Acquires Celgene**

On January 3, 2019, BMS and Celgene announced that they had signed a merger agreement by which BMS would acquire Celgene for $74 billion (the "Merger"). Counterclaims ¶ 58. The Merger was subject to antitrust review by the FTC under the HSR Act. The FTC investigated the Merger's effects on competition, and this investigation addressed Celgene's rights to Nimbus's Tyk2 asset under the Warrant and BMS's own Tyk2 inhibitor, deucravacitinib. Id. ¶ 60. The FTC ultimately approved the merger, with the commissioners voting 3-2 on November 15, 2019 to approve a consent agreement in which Celgene and BMS would divest Celgene's worldwide Otezla (apremilast) business to Amgen, another pharmaceutical company. Id. ¶ 66.[4] The Merger closed on November 20, 2019, and Celgene became a wholly owned subsidiary of BMS. Id. ¶ 67.

Nimbus and Celgene continued their collaborative Tyk2 R&D program following the Merger, though the parties dispute whether and how the

---

[4] Each side quotes from various statements issued by FTC Commissioners in connection with this vote. None is dispositive and it is black letter law that the FTC's decision to settle and not to file a complaint seeking to block the merger does not establish that the merger was lawful under the Sherman and Clayton Acts. See 15 U.S.C. § 45(e) ("No order of the Commission or judgement of court to enforce the same shall in anywise relieve or absolve any person, partnership, or corporation from any liability under the Antitrust Acts.").

Merger effected the companies' relationship. Nimbus has submitted a declaration from its chief executive officer, Jeb Keiper. See ECF 23 ("Keiper Decl."). Keiper has been CEO of Nimbus since October 2018 and previously worked as its chief financial officer (2017-2018) and chief business officer (2014-2017). Id. ¶ 1. Keiper recounts a series of communications with Celgene by email and phone following the Merger announcement, which he describes as "attempts to solicit an agreement to terminate the [Warrant] once the BMS acquisition of Celgene was complete." Id. ¶ 4.

For instance, on Friday November 15, 2019 (the same day the FTC voted to approve the Merger), Keiper emailed Rupert Vessey at Celgene, writing:

> Just a courtesy note to let you know that our Tyk2 IND for NDI-034858 has been filed with FDA. As you know FDA have 30 calendar days to review and get back to us if any comments.... As I shared with you in summer, our understanding of the situation is that once the merger with BMS is finally closed shortly, you will have two Tyk2 compounds in clinical development as well as preclinical backups inside BMS beyond that. Given that, Nimbus understands and appreciates the 'need' for a Tyk2 has changed radically for you since we first did the deal in 2017, and **we would much prefer to have the rights back to the program and progress ourselves**, **avoiding the tension of engaging regularly with a fierce competitor that has a massive head start.** Please appreciate that we recognize the difference between the strategic position now and the people involved – we really love working with your teams, and have such fondness and respect for them, and frankly are sad that this period of positive engagement on Tyk2 is ending, but we remain buoyed by the opportunity of continuing to engage with HPK1, where any competitive efforts are likely much more parallel, and much better suited for collaboration.

ECF 23-2 at 3 (emphasis added).Vessey responded by email that "[w]e have a process in place with BMS to address the questions below." Id. at 2.

Keiper describes his communication as "ask[ing] ... to terminate the relationship," Keiper Decl. ¶ 5, a characterization not wholly supported by the email quoted above. Celgene and BMS have submitted a declaration from Vessey explaining that he took the email "as a means to seek a dialogue to discuss and evaluate the parties' relationship post-BMS's acquisition of Celgene." Declaration of Rupert Vessey, ECF 26 ¶ 4. Vessey further explains that he "had additional conversations with Mr. Keiper" after that email and that he does not believe Keiper ever "purported to terminate the Warrant, claimed that Celgene had already violated antitrust law through its acquisition by BMS or had somehow already breached the Warrant," though Keiper "may have encouraged Celgene to voluntarily agree to terminate the Warrant" in view of potential FTC scrutiny should Celgene seek to acquire Nimbus Lakshmi. Id. ¶ 5. While Keiper also reports that Celgene and BMS cancelled the December 3, 2019 quarterly meeting of the Nimbus-Celgene Joint Steering Committee governing the Tyk2 collaboration, Keiper Decl. ¶ 5, subsequent Steering Committee meetings did occur, see Mily Decl. ¶ 29.

In December 2019, Celgene sent Nimbus the $15 million payment required within 10 days of the FDA's acceptance of Nimbus's Investigational New Drug Application. See Mily Decl. ¶ 26; Warrant § 2.1(a)(ii). Nimbus accepted the $15 million payment. Id. ¶ 27.

Then, on February 12, 2020, Celgene emailed Nimbus a list of three BMS employees with access to confidential information about BMS's deucravacitinib, who would be screened from information about

Nimbus's allosteric Tyk2 inhibitor research. See id. ¶ 28; Ex. 6 to Mily Decl. Nimbus's vice president for business development wrote that Nimbus had "no objections" to this arrangement. See id.

Keiper also highlights a pair of conversations he had with Dr. Giovanni Caforio, the chief executive officer of BMS. First, on March 27, 2020, Keiper states that he "raise[d his] concerns about the risk of uncertainty for Nimbus" and that Nimbus's position was that if deucravacitinib was "successful in its Phase 3 trials ... the Warrant certainly needed to be terminated." Keiper Decl. ¶ 6. In his own declaration, Caforio denies that Keiper ever "purport[ed] to terminate the Warrant" or "assert that [the Merger] was itself an antitrust violation" or "a breach of the Warrant." Declaration of Dr. Giovanni Caforio, ECF 25 ¶ 5.

Finally, on February 3, 2021, Keiper and Caforio held a video call following BMS's announcement that deucravacitinib had successfully completed Phase 3 trials. Implicitly conceding that he had not previously done so, Keiper states that in this video call he "explicitly asked Dr. Caforio to terminate the relationship amicably." Keiper Decl. ¶ 9. Keiper reports that Caforio insisted on leaving the Warrant in place and that BMS would review Nimbus's Phase 1B trial results before deciding how to proceed. Id. ¶ 9. Caforio describes the conversation similarly. He recalls Keiper expressing doubts that the FTC would clear BMS to acquire Nimbus Lakshmi and "asked if Celgene would agree to give the molecule back to Nimbus," a request Caforio said he declined. Caforio Decl. ¶ 6. Caforio also recalls that Keiper

"did express some concern about sharing the Phase 1b data with BMS, claiming BMS was a competitor." Id. ¶ 7. But Caforio denies that Keiper ever "purport[ed] to terminate the Warrant" or "claim[ed] that BMS's acquisition of Celgene was itself an antitrust violation" or "a breach of the Warrant." Id.

C. **Celgene Seeks to Exercise the Warrant**

Celgene delivered Nimbus the Notice of Interest on June 1, as required by the Warrant's timetable. Counterclaims ¶ 80. As part of this process, BMS has demanded access to review Nimbus's Tyk2 confidential business information, including sensitive research data, which Nimbus alleges BMS could use to harm Nimbus's ability to compete. The FTC subsequently issued an HSR Act Second Request, and the parties have apparently cooperated in responding to the Second Request. The parties adhered to the Warrant's other deadlines until August 13, 2021, when Nimbus delivered a letter to Celgene purporting to unilaterally terminate the Warrant on the ground that Celgene had breached its covenants and representations in the Warrant. See Ex. 10 to Mily Decl., ECF 18-10 ("August 13 Letter"). Nimbus filed this lawsuit the same day.

In the August 13 Letter, Nimbus cited Celgene's covenant not to "'violate any Applicable Law [including federal antitrust laws] ... solely to the extent that such breach or violation would have a material adverse impact on Celgene's ability to consummate the transactions contemplated hereby'" and Celgene's covenant to "'use commercially reasonable efforts to comply with, and [] refrain from

taking any action that would impede compliance with, all Applicable Laws [including federal antitrust laws].'" Id. at 2 (quoting Warrant §§ 5.3, 6.8 (alterations in original)). Nimbus argued both that the 2019 merger of BMS and Celgene violated federal antitrust laws, because BMS controlled deucravacitinib, Nimbus's main competitor in the nascent market for allosteric Tyk2 inhibitors, and also that Celgene's exercise of the Warrant violated federal antitrust laws because it would allow Celgene and BMS to monopolize the allosteric Tyk2 inhibitor market. Id. at 3. Nimbus contends the August 13 Letter immediately terminated the Warrant. Celgene and BMS argue that Nimbus failed to terminate the Warrant, because Warrant § 10.1(c) requires that unless the alleged breach was incurable, Nimbus must provide Celgene with 30 days' notice and an opportunity to cure. Rather, Celgene and BMS allege that the August 13 Letter constitutes a breach of the Warrant by Nimbus. Counterclaims ¶¶ 118-129.

October 11, 2021, the day before argument was held on this motion, was Celgene's deadline under the Warrant to deliver a "notice of exercise." Id. ¶ 78. At argument, Celgene and BMS's counsel explained that Celgene had not delivered a notice of exercise by the October 11, 2021 deadline. Rather, in light of Nimbus's purported termination of the Warrant, Celgene "sent a letter on Friday, ... before that deadline, saying that we're reserving our rights with respect to that deadline" because Nimbus's counsel had previously indicated that it was "not intending to honor [Celgene's] notice of exercise." Tr. 3-4.

## II.  **Procedural Posture**

Nimbus filed its Complaint on August 13, 2021, the same day it purported to terminate the Warrant. The Complaint alleged essentially the same theory Nimbus outlined in its August 13 Letter and sought termination of the Warrant, an injunction prohibiting Celgene's exercise of the Warrant, and antitrust damages arising from the Merger and other conduct. ECF 1. Celgene and BMS then filed counterclaims on September 15, 2021, alleging, inter alia, that Nimbus's anticipatory repudiation of the Warrant was both ineffective and constituted breach and seeking specific performance of the assignment provision. ECF 15. Celgene and BMS simultaneously filed this motion for a preliminary injunction. ECF 16.

The Motion asks the Court to preserve the status quo by "preliminarily enjoining Nimbus from taking any actions inconsistent with the Warrant, including but not limited to, selling or otherwise transferring interests in the Tyk2 Asset or Nimbus Lakshmi to third parties, and tolling the time for Celgene or its assignee to exercise the Warrant from the date when Nimbus Lakshmi unilaterally claimed that the Warrant was terminated on August 13, 2021, through the pendency of this litigation." Mot. 25. In its opposition, Nimbus argues that the language of the requested injunction is vague and states that it has "no present interest to sell or transfer its allosteric TYK2 asset and [is] prepared to stipulate as such through the trial ready date," which is currently February 17, 2022. Opp. 2; ECF 19 at 1. However, the parties confirm that no such stipulation has been reached.

See Reply 5 n. 7. Celgene and BMS, for their part, maintain that their objective is to preserve their entitlement to assign Celgene's purchase right under the Warrant after the conclusion of this litigation.

III.  **Validity of the Warrant**

As a threshold matter, Nimbus argues that Celgene and BMS cannot obtain a preliminary injunction because Nimbus purports to have terminated the Warrant through its August 13, 2021 letter. Therefore, Nimbus argues, a preliminary injunction would involve "changing the status quo" by "effectively locking up Nimbus's asset until this litigation is over" through reimposition of contractual duties. Opp. 8. "The Court cannot enjoin the termination that has already happened," Nimbus contends, and "revival of the Warrant is not a remedy that can or should be granted on a motion for preliminary injunction." Id.

But the Court is not so constrained. Whether Nimbus's August 13 Letter was effective in terminating the contract depends in part on whether Nimbus was justified in asserting that Celgene had incurably and materially breached its covenants. See Warrant § 10.1(c). That is a dubious proposition for reasons explained further below.

As Celgene and BMS argue, Nimbus's August 13 Letter amounts to an anticipatory repudiation of the Warrant. See Reply 4. "Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty. Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002). The Second Circuit has held that under New York contract law, "[w]hen confronted with an anticipatory repudiation, the

non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit." Id., 310 F.3d at 258. The non-repudiating party must "make an affirmative election," because it "cannot at the same time treat the contract as broken and subsisting, for one course of action excludes the other.... Once a party has elected a remedy for a particular breach, his choice is binding with respect to that breach and cannot be changed." Id. at 258-259. Celgene pronounces in its reply brief that it "has elected to [treat the contract as valid and await the designated time for performance before bringing suit."[5] Reply 4. Where a party chooses this route, it remains entitled to performance. See, e.g., Jamuna Fashion Wears Ltd. v. Micom Trading Corp., 2012 WL 13140780, at *4 (S.D.N.Y. Dec. 28, 2012).

The Court need not decide the ultimate effect of the August 13 letter now. It is enough at this juncture to conclude that Celgene and BMS are likely to succeed on the merits in demonstrating that Nimbus's August 13 Letter did not terminate the Warrant and so it erects no bar to granting Celgene and BMS's motion for a preliminary injunction.

---

[5] Celgene does not explain how its decision to send Nimbus a "letter ... reserving [its]rights with respect to [the notice of exercise] deadline" rather than to deliver a notice of exercise on October 11, 2021 is consistent with the choice to treat the contract as valid. See Tr. 3. But the Court need not resolve that issue now.

## IV.   **Preliminary Injunction**

"A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015).[6] Nimbus suggests the standard is elevated because the motion purportedly seeks a mandatory injunction that would change the status quo. Opp. 7-8. If so, Celgene and BMS would have to "show a 'clear' or 'substantial' likelihood of success on the merits and make a 'strong showing' of irreparable harm. Id.[7] The Second Circuit has recognized that the always-ambiguous distinction between mandatory and prohibitory injunctions is particularly murky in contract cases.[8]

---

[6] Neither party contends that the serious questions prong applies here. See Actavis PLC, 787 F.3d at 650.

[7] A higher standard also applies where the preliminary injunction would provide substantially all the relief the movant ultimately seeks and that relief cannot be undone if the non-movant prevails at trial. See Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 34 (2d Cir. 1995). Neither party argues that the instant motion implicates this issue.

[8] See Tom Doherty Assocs., Inc., 60 F.3d at 34 ("Confusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of 'status quo.' A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory.").

But as explained above, Nimbus's position depends on the premise that its August 13 Letter terminated the Warrant, a premise the Court has rejected for the purpose of deciding this motion. The ordinary preliminary injunction standard therefore applies, though it may be noted that the Court would grant the motion under either standard.

A. **<u>Likelihood of Success on the Merits</u>**

Celgene and BMS argue that it is likely to succeed in establishing that it is entitled to specific performance of the Warrant's assignment clause. This entails four constituent propositions, which Celgene and BMS assert they will succeed in proving on the merits: (i) the Warrant entitles Celgene to assign to another pharmaceutical company its rights to acquire the Tyk2 assets; (ii) Nimbus cannot repudiate the Warrant based on BMS's acquisition of Celgene; (iii) Celgene is likely to establish the predicates to specific performance of the Warrant; and (iv) granting specific performance of the assignment provision would not contravene the antitrust laws. As explained below, the Court concludes that Celgene and BMS are likely to succeed on all four issues.

a. **<u>Celgene's Entitlement to Assign</u>**

Section 11.2(a)(iii)(z) of the Warrant plainly entitles Celgene to assign its right to purchase the Tyk2 assets to another pharmaceutical company with similar or better resources in the event a federal antitrust enforcement agency issues the parties an HSR Second Request in connection with Celgene's demonstrated intent to exercise the Warrant. Nimbus disputes neither Celgene's construction of this

assignment provision nor that it was triggered when the FTC issued the Second Request. See Opp. 19-20.

Instead, Nimbus suggests that "the Court should doubt the bona fides of Defendants' self-serving representation that they will assign the Warrant to a third party given [their] representations to the federal government in their HSR filing that they intend to acquire Nimbus's allosteric Tyk2 asset." Opp. 19. Nimbus argues that "Defendants have not taken any action that would bind them to assign, rather than acquire" the Tyk2 assets. But this is a red herring. The HSR Act bars Celgene from acquiring the Tyk2 assets unless the FTC clears the transaction as consistent with the federal antitrust laws. Separately, if Nimbus prevails in this litigation on its claim that Celgene's acquisition of the Tyk2 assets would violate the antitrust laws, then this Court could enter a permanent injunction prohibiting Celgene from closing on the transaction. But if Celgene prevails in demonstrating that its exercise of the Warrant would be legal under the antitrust laws, both before the FTC and in this litigation, then Celgene would be entitled to acquire the Tyk2 assets and the preliminary injunction preserving its rights under the Warrant would have prejudiced neither Nimbus nor the public interest. What matters at this juncture is whether Celgene will be likely to prevail in proving either that it may acquire the Tyk2 assets or that it may

assign that right, since neither party has suggested that the preliminary relief necessary to preserve those rights would differ.[9]

Since Celgene and BMS will likely succeed in establishing that the Warrant entitles Celgene to assign the right to purchase the Tyk2 assets, then they will have established a likelihood of success on the merits overall by also demonstrating a likelihood of success in proving that the Warrant has not been terminated and should not be rescinded, that Nimbus breached the Warrant and specific performance is the appropriate remedy, and that Celgene's assignment of its right to acquire Nimbus Lakshmi would not contravene federal antitrust law. So, the Court turns to these.

b. **Termination & Breach**

Nimbus asserts that it is no longer bound to perform under the Warrant, either because the August 13 Letter terminated the Warrant or because the Court should rescind the Warrant because Celgene allegedly breached its covenants. The Court, however, concludes that Celgene and BMS are likely to rebut both of Nimbus's termination arguments, and thus that the Warrant is likely still enforceable.

---

[9] Specifically, Celgene argues that the relevant obligation arises from the parties' covenant to "use commercially reasonable efforts to take, or cause to be taken, all reasonable actions, and to do, or cause to be done, and to assist and cooperate with the other Party in doing, all things reasonably necessary, proper or advisable to consummate the transactions contemplated hereby." Warrant § 6.8(d); See Mot. 13-14.

i.  **The August 13 Letter**

Nimbus first argues that its August 13 Letter successfully terminated the Warrant. Nimbus presents this argument through the Complaint's first count, which seeks a declaration that the August 13 Letter terminated the Warrant. See Complaint ¶¶ 45-52. Celgene and BMS counter, inter alia, that Nimbus failed to provide the contractually required thirty-day notice and opportunity to cure, so the purported termination letter was a nullity. See Counterclaims ¶¶ 107-117 (first counterclaim, seeking declaratory judgment).

The parties agree that the only potential basis for Nimbus to have unilaterally terminated the Warrant via the August 13 Letter would be under Section 10.1(c). That provision permits unilateral termination by Nimbus "upon a material breach of any representation, warranty, covenant, or agreement on the part of Celgene set forth in this Warrant ... or if any representation or warranty of Celgene shall have become materially untrue, in either case such that the conditions set forth in [the closing conditions] would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become untrue." Warrant § 10.1(c). But Nimbus must provide Celgene notice and a 30-day opportunity to cure unless the alleged breach is incurable. Id.

Such notice-and-cure provisions are generally enforced. "Under New York law, where the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with." Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 727 (2d Cir. 1992) (affirming

conclusion that party's failure to comply with 30-day notice and opportunity to cure provision constituted breach). Whether the August 13 letter could properly terminate the Warrant therefore turns in part on whether Celgene's alleged material breaches of the covenants were curable.

Nimbus naturally argues that Celgene had incurably breached by "pursuing the Tyk2 asset for themselves" and by merging with BMS, which Nimbus describes as having "attempted to monopolize or otherwise unlawfully restrain[] competition" in violation of the Sherman Act. Opp. 13-14 The Merger, Nimbus argues, "created an insurmountable antitrust issue for the exercise of the Warrant as early as late 2019." Id. Nimbus asserts that notice was unnecessary under the Warrant because it "would have been futile," since Celgene and BMS "rejected" Nimbus's prior attempts "to have BMS take some action to cure the anticompetitive relationship." Id. at 23. Celgene and BMS counter that the Warrant itself provides the cure to the alleged antitrust problem arising from Celgene's exercise of the Warrant's right to acquire Nimbus's Tyk2 assets: assignment. Reply 9.

The Court holds that Celgene is likely to succeed in showing that Nimbus's August 13 letter did not terminate the Warrant. Nimbus cannot evade the 30-day notice-and-opportunity-to-cure requirement by invoking the general doctrine of futility. "Under New York law, a terminating party's failure to afford contractually-required notice and cure is excusable as futile only in limited circumstances. Among these are where the non-performing party (1) expressly repudiates the

parties' contract or (2) abandons performance thereunder." Point
Prods. A.G. v. Sony Music Ent., Inc., 2000 WL 1006236, at *4 (S.D.N.Y.
July 20, 2000). Celgene never repudiated the Warrant. And Nimbus
alleges no failure of performance, other than the Merger, which likely
does not establish breach for the reasons explained below.

And even if the Merger did lead Celgene to breach its covenants
by creating an antitrust obstacle to its own acquisition of Nimbus
Lakshmi, Celgene and BMS are likely to prove that assignment was an
appropriate cure, so the August 13 Letter was procedurally defective
under Section 10.1(c) of the Warrant.

Nimbus responds that Celgene has taken no action that binds it
to assign rather exercise the Warrant. Opp. 19-20. But that is
irrelevant to whether assignment could cure the alleged breach. Nimbus
also argues that assignment is not guaranteed to be procompetitive,
but these contentions fail for reasons addressed in the discussion of
Nimbus's antitrust defense to specific performance, discussed below.
If Celgene attempted to scuttle Nimbus's Tyk2 asset through assignment,
Nimbus might be able sue under the contract. But the prospect of
Celgene acting in bad faith does not change the fact that the express
purpose of the assignment provision is to cure antitrust issues that
might arise preventing Celgene's own exercise of the Warrant.

Since a cure to the alleged breach was available, Celgene and BMS
will likely prove that Nimbus was not entitled to unilateral
termination, so the August 13 Letter did not terminate the Warrant.

ii.   **Celgene's Alleged Breach of Covenants**

Nimbus has alleged that Celgene "breached the representations and warranties" not to break applicable law and to cooperate toward consummation of the transactions contemplated by the Warrant, because the Merger allegedly violated the Sherman and Clayton Acts, so Nimbus has sought recission and termination of the Warrant. See Compl. ¶¶ 53-57 (Count II: Breach of Contract). Thus, as relevant to this motion, Nimbus is effectively raising a contract defense to the counterclaim for specific performance, arguing that Celgene already breached so no performance is now due from Nimbus.

This breach of contract theory essentially repackages the allegations asserted in the August 13 Letter and the declaratory judgment claim. It therefore seeks cancellation of the contract in a manner calculated to circumvent the termination provisions of Article X of the Warrant. As explained above, where a contract includes a termination provision setting forth certain procedures for the contract's cancellation, including a requirement for notice and an opportunity to cure, "the general rule is that a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract." Karabu v. Pension Benefit Guar. Corp., 1997 WL 759462, at *8 (S.D.N.Y. Dec. 10, 1997). See also Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 519 (2d Cir. 1989) ("apply[ing] the clear New York rule requiring termination of a contract according to its terms," where a termination provision requires 30-day notice and an

opportunity to cure an alleged breach). New York law is also clear that "[f]reedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain." Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 695 (1995). See also Flag Wharf, Inc. v. Merrill Lynch Cap. Corp., 40 A.D.3d 506, 507 (1st Dep't 2007) ("Courts will not rewrite contracts that have been negotiated between sophisticated, counseled commercial entities."). Since accepting Nimbus's breach of contract claim would undermine Celgene's contractually secured right to cure an alleged default of any representation, covenant, or warranty, Nimbus's request for rescission is disfavored.

The Court concludes that Celgene and BMS will likely succeed in resisting Nimbus's attempt to obtain rescission of the Warrant on either version of this theory.

First, Nimbus alleges that the Merger violated the Sherman and Clayton Acts, so Celgene allegedly committed a material breach of its covenants to follow applicable laws. See Complaint, Count II. Among Celgene's warranties, covenants, and representations in the Warrant is Section 6.8(a), which includes a mutual covenant that the parties shall "coordinate and cooperate with one another and shall each use commercially reasonable efforts to comply with, and shall each refrain from taking any action that would impede compliance with, all Applicable Laws." Nimbus's argument, therefore, is that by agreeing

to the Merger, Celgene failed to "use commercially reasonable efforts to comply with" federal antitrust laws, because the Merger allegedly violated the Sherman and Clayton Acts. Another version is that by agreeing to the Merger, Celgene failed to "refrain from taking any action that would impede compliance with" federal antitrust laws when it came time for it to exercise the Warrant, since the Merger made it more likely that antitrust authorities would scrutinize Celgene's attempt to acquire Nimbus Lakshmi.

Celgene and BMS counter that Nimbus has waived its right to obtain recission or termination of the contract on this basis. According to Celgene and BMS's telling, Nimbus learned of the Celgene-BMS merger on January 3, 2019, when it was publicly announced, but it "did not seek to terminate the Warrant on the basis that this 2019 merger caused Celgene to breach the Warrant for thirty-one months, until its August 13 Letter." Mot. 21-22. Rather, Celgene and BMS assert that Nimbus "continued to act affirmatively as though the Warrant was in effect," including by "accept[ing] an additional $15 million payment under the Warrant by Celgene in December 2019 (a month after the merger had closed)," by agreeing to a screening protocol to prevent BMS employees working on deucravacitinib from learning confidential information about Nimbus's Tyk2 program, and by sending Celgene the data package with Phase 1B clinical trial results on May 4, 2021. Id.

It is well established in New York law that a party can waive any right to rescind a contract on a theory of breach when the allegedly injured party has failed to promptly assert its claim:

> [W]here a party to a contract asserts a right to rescind for ... breach of contract ... there can be no rescission where the breach of contract ... has been waived by the party who has been wronged; and, as a matter of law, right to rescind must be exercised promptly after the injured party learns of the wrong. Acceptance of benefit under the contract with knowledge of the wrong constitutes a waiver of the wrong. Notice of rescission for wrong which has been waived is, of course, a futile act.... Recognition that the contract is still in force may prove such abandonment and constitute a waiver of a previous breach.

New York Tel. Co. v. Jamestown Tel. Corp., 282 N.Y. 365, 372-373 (1940).

Celgene and BMS argue that Nimbus continued to treat the Warrant as an intact contract after the Merger closed in November 2019. For instance, Nimbus accepted the $15 million payment from Celgene in December 2019, after its CEO asserts that he was cognizant of the "'tension of engaging regularly with a fierce competitor [BMS] that has a massive head start.'". Keiper Decl. ¶ 5 (quoting ECF 23-2 at 3 (alteration in original)). While Keiper expressed concerns about the Merger's implications for the Tyk2 collaboration, the current record reflects no assertion by Nimbus that the Merger had caused Celgene to have breached the Warrant. Rather, Celgene stated that it had "a process in place with BMS to address" the competition concerns Keiper had raised. See ECF 23-2 at 2. Then, in February 2020, Celgene proposed an information screening protocol to prevent BMS employees working on deucravacitinib from having access to confidential information about Nimbus's allosteric Tyk2 inhibitor. See Mily Decl. ¶ 28. Nimbus agreed to that protocol. See Ex. 6 to Mily Decl., ECF 18-6.

The record reflects that Nimbus never expressly sought termination of the Warrant until February 23, 2021 at the earliest, see, e.g., Keiper Decl. ¶ 9, nor did it assert that Celgene had breached the Warrant until the August 13 Letter. But since "waiver of a contract right must be proved to be intentional, the defense of waiver requires a clear manifestation of an intent by [the party asserting breach] to relinquish her known right and mere silence, oversight, or thoughtlessness in failing to object to a breach of the contract will not support a finding of waiver." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 585 (2d Cir. 2006). Nimbus maintains that it never waived any right to rescind. Instead, Nimbus argues, it raised concerns about the antitrust implications of the Merger for years and sought to "fix the anticompetitive relationship between the parties." Opp. 22.

But stating that Nimbus "would much prefer to have the rights back to the program and progress [itself]," ECF 23-2, is not the same as purporting to terminate the Warrant or alleging that Celgene had breached. And while "intent to waive is usually a question of fact, knowing acceptance of [payment] without any effort to terminate justifies an inference that" the contract remains in force. Jefpaul Garage Corp. v. Presbyterian Hosp., 61 N.Y.2d 442, 460 (1984). Nimbus's acceptance of the $15 million payment in December 2019 therefore justifies the inference that Nimbus intended the Warrant to remain in force notwithstanding the "tensions" introduced by the Merger. And

-28-

Nimbus's agreement to the February 2020 screening protocol further supports that inference.

Concededly, the record is incomplete at this juncture; but the Court concludes that Celgene and BMS are likely to succeed in its position that Nimbus waived its right to obtain recission of the Warrant in response to Celgene's alleged breach of its covenants to comply with the federal antitrust laws.[10]

In any event, even if Celgene and BMS failed to prove Nimbus's waiver, so that the Court later reached the merits of Nimbus's breach of contract claim, Celgene and BMS would raise various potentially meritorious defenses to Celgene's alleged breach of its covenants. For instance, the covenant in section 6.8(a) "is heavily qualified by the commercially reasonable efforts standard, which means that Celgene 'was not required to do things that it was unable to do or that it would not have made commercial sense to do.'" Reply 8 (quoting In re Condado Plaza Acquisition LLC, 620 B.R. 820, 833 (Bankr. S.D.N.Y. 2020). This, Celgene and BMS argue, differentiates Nimbus's claim from a straightforward question of whether a direct suit under the Sherman or Clayton Acts would have succeeded in blocking the Merger had it

---

[10] Nimbus points out that it is separately "challenging the enforceability of the Warrant under various claims under the Sherman Act and the Clayton Act," and that these claims have four-year statutes of limitations. Opp. 22-23 (citing 15 U.S.C. § 15b). But whether claims arising under the antitrust laws themselves are timely is a distinct issue from whether Nimbus may still assert a defense to a counterclaim for specific performance (or a claim for breach of contract) based on an alleged violation of the antitrust laws.

been filed at the time. The question instead might be whether it would have been commercially reasonable for Celgene to resist BMS's acquisition effort <u>after</u> the transaction received the FTC's approval following HSR Act review, or if the commercially reasonable approach would have been to resist the Merger entirely. Whatever the merits an action under the Clayton or Sherman Acts would have been, the covenant's "commercially reasonable efforts" qualification makes it more likely Celgene and BMS would succeed in resisting the Warrant's recission on this ground.

Celgene and BMS also argue that Nimbus has also failed to allege or argue that any breach of the Warrant by Celgene was material. "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." <u>Process Am., Inc. v. Cynergy Holdings, LLC</u>, 839 F.3d 125, 136 (2d Cir. 2016). Recission is therefore "not permitted for a slight, casual, or technical breach, but, as a general rule, only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." <u>Callanan v. Powers</u>, 199 N.Y. 268, 284 (1910). Here, however, Celgene and BMS argue that even assuming <u>arguendo</u> that the Merger did violate the antitrust laws, the consequent breach of its covenants was not "a failure which le[ft] the subject of the contract substantially different from what was contracted for." <u>Id.</u> Indeed, if Celgene were to assign to another similarly situated

-30-

pharmaceutical company the right to acquire Nimbus Lakshmi for $400 million -- a transaction contemplated by the Warrant as a cure if Celgene's own acquisition of the Tyk2 asset invokes antitrust scrutiny -- Nimbus Therapeutics would likely be left in a substantially similar position to the one it contemplated at the time the Warrant was created: in receipt of $400 million and engaged in an ongoing business relationship with a large pharmaceutical company to commercialize the Tyk2 inhibitor molecule.

Therefore, the Court concludes that even if Nimbus prevailed on the waiver issue, Celgene and BMS would still likely succeed in resisting Nimbus's attempt to obtain recission of the Warrant because the Merger allegedly violated the antitrust laws.

Separately, Nimbus suggests that Celgene breached its Section 6.8(a) covenant to cooperate with Nimbus to achieve compliance with federal antitrust laws and that Celgene failed to use commercially reasonable efforts to achieve government approval for its exercise of the Warrant. Opp. 14-15. But the Court concludes that Nimbus will likely fail to establish that Celgene breached the Warrant by allegedly failing to cooperate.

Nimbus alleges that Celgene failed to cooperate in achieving compliance with antitrust laws because "Nimbus's efforts to fix the antitrust issues presented by [the Merger] were expressly and repeatedly rejected by BMS." Opp. 15. But as Celgene and BMS argue, "a covenant to cooperate is not a covenant to surrender; it does not oblige a party to give up its express rights under the contract."

Reply 7. In any event, Nimbus does not identify any proposed "fix" that BMS rejected, other than termination of the Warrant. See generally Opp. 15-18; Keiper Decl.[11] Termination was first expressly requested in February 2021 and Nimbus has not explained why the covenant to cooperate obliged BMS to relinquish its contractual rights, particularly when its position is that the Warrant's assignment provision is the cure to any alleged antitrust issues arising from Celgene's acquisition of Nimbus Lakshmi. Therefore, Celgene and BMS are likely to succeed in repulsing Nimbus's claim that Celgene breached its obligation to cooperate in achieving compliance with federal antitrust laws.

Nimbus also argues that Celgene failed to coordinate and cooperate in obtaining FTC approval for its exercise of the Warrant. See Opp. 14-15. But Celgene and BMS cogently argue that since the Warrant entitles Celgene to assign its acquisition right after issuance of a Second Request, it has no "obligation to continue to work toward antitrust clearance of an exercise by Celgene and not an assignee," especially when Nimbus alleges Celgene's acquisition of Nimbus Lakshmi would be illegal under the federal antitrust laws. Reply 8. The Court concludes Celgene are BMS are likely to succeed on this issue as well.

---

[11] To the contrary, the record reflects that to address tensions arising from the Merger, Celgene and BMS established an information screening protocol in February 2020, to which Nimbus consented without objections. See ECF 18-6.

In sum, the Court concludes that Nimbus is unlikely to prevail in either establishing that the Warrant was terminated via the August 13 Letter or that the Court ought to rescind the Warrant as a remedy for Celgene's alleged breaches of its covenants to comply with federal antitrust laws or to cooperate with Nimbus in achieving compliance. Celgene and BMS are thus likely to succeed on the merits of their first counterclaim, which seeks a declaration that the Warrant entitles Celgene to assign its right to acquire Nimbus Lakshmi and that the Warrant remains enforceable. See Counterclaims ¶¶ 107-117. Therefore, Celgene and BMS are likely to succeed on their counterclaim for specific performance of the assignment provision if Celgene and BMS will likely establish their entitlement to specific performance and unless Nimbus Celgene's use of the Warrant's assignment provision would likely be illegal under the federal antitrust laws. So, the Court now turns to these remaining two issues.

c. **Celgene's Entitlement to Specific Performance**

The Court has already found that Celgene and BMS will likely establish that the Warrant entitles Celgene to assign the right to acquire Nimbus Lakshmi and that the Warrant is neither terminated nor subject to recission. Therefore, leaving aside Nimbus's antitrust defenses for the moment, Celgene and BMS are likely to establish an entitlement to specific performance of the assignment clause if they will prove that Nimbus materially breached the contract and that the

-33-

appropriate remedy for that material breach is specific performance.[12]
See Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.,
112 A.D.3d 78, 86 (1st Dep't 2013) ("[S]pecific performance is an
equitable remedy for a breach of contract, rather than a separate
cause of action."). The Court concludes that Celgene and BMS are likely
to succeed on both issues.

First, Celgene and BMS are likely to establish that Nimbus
materially breached the Warrant. Celgene and BMS allege, inter alia,
that Nimbus breached two covenants by purporting to terminate the
Warrant in its August 13, 2021 Letter, by filing the instant
litigation, and by otherwise refusing to cooperate with Celgene's
effort to make an assignment under the Warrant. See Counterclaims
¶¶ 124-125.

Celgene and BMS cite two covenants or representations. Section
6.8(d) requires the parties to "use commercially reasonable efforts
to take, or cause to be taken, all reasonable actions, and to do, or

---

[12] Celgene would also need to establish that it substantially
performed under the Warrant. See NML Cap., Ltd. v. Republic of
Argentina, 699 F.3d 246, 261 n. 12 (2d Cir. 2012) ("To be eligible for
specific performance of a contractual provision, a party also needs
to show that (1) a valid contract exists between the parties, (2) the
plaintiff has substantially performed its part of the contract, and
(3) plaintiff and defendant are each able to continue performing their
parts of the agreement."). The only relevant aspect of Celgene's
performance that Nimbus disputes is whether Celgene satisfied its
covenants or breached them by consummating the Merger. Since the Court
concluded that Celgene and BMS are likely to succeed in establishing
that Celgene did not materially breach its covenants, the Court
accordingly holds that it they also will likely prove that Celgene
adequately performed its contractual duties under the Warrant.

cause to be done, and to assist and cooperate with the other Party in doing, all things reasonably necessary, proper or advisable to consummate the transactions contemplated [in the Warrant.]" Warrant § 6.8(d). Section 11.13 commits the parties "to execute, acknowledge and deliver such further instruments, and to do all such other acts, as may be reasonably necessary or appropriate in order to carry out the purposes and intent of this Warrant." Warrant § 11.13.

Celgene and BMS are likely to succeed in proving that Nimbus's purported termination and refusal to cooperate with an assignment amounted to a material breach of these representations. Nimbus' claim to have terminated the Warrant and its subsequent refusal to acknowledge Celgene's attempts to make an assignment impeded Celgene from obtaining any value from the Warrant, denying Celgene the benefit of its bargain. It plainly violated the commitment to cooperate in bringing about an assignment, which is clearly a "transaction contemplated" in the Warrant. Warrant § 6.8(d). Preventing Celgene from realizing the benefit of its bargain also frustrated the "purposes and intent of th[e] Warrant." Warrant § 11.13. And these breaches are likely material, because preventing Celgene from monetizing its successful investment in the Tyk2 R&D program defeats the fundamental purpose of the Warrant.

Celgene and BMS are also likely to succeed in proving that Nimbus's purported termination amounts to an independent breach. The Second Circuit has recognized that a party's purported termination that does not follow contractually secured, applicable termination

procedures may itself constitute an independent breach of the contract. See Bausch & Lomb Inc., 977 F.2d at 727. As explained above, Celgene and BMS are likely to demonstrate that the August 13 Letter failed to adhere to the enforceable termination procedures and so amounted to breach.

Celgene and BMS are also likely to succeed in demonstrating that Celgene is entitled to specific performance as a remedy for Nimbus's material breach of the Warrant. Under New York law, "[s]pecific performance may be ordered where no adequate monetary remedy is available and that relief is favored by the balance of equities, which may include the public interest." NML Cap., Ltd. v. Republic of Argentina, 699 F.3d 246, 261 (2d Cir. 2012). There is no adequate monetary remedy and so "[s]pecific performance is a proper remedy ... where the subject matter of the particular contract is unique and has no established market value," so the claimant would have "difficulty [in] proving damages with reasonable certainty." Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 415 (2001). As explained further below in the discussion of irreparable harm, the Tyk2 asset held by Nimbus Lakshmi is a unique asset, still in development, with no established market value. Therefore, damages would be difficult to ascertain with reasonable certainty. Celgene would thus likely succeed in establishing that specific performance of the assignment provision is an appropriate remedy.

### d. **<u>Legality of the Assignment Provision Under the Antitrust Laws</u>**

As to the final issue regarding likelihood of success on the merits, Nimbus's complaint alleges that Celgene's exercise of the Warrant to acquire Nimbus Lakshmi would be anticompetitive because it would give BMS control over both the leading allosteric Tyk2 inhibitor drug candidates, and so it must be invalidated as contrary to the Sherman and Clayton Acts. In the context of this motion, those arguments arise as antitrust defenses to Celgene's claim for specific performance. Celgene argues in support of its motion that assignment of its purchase rights to a similarly situated pharmaceutical company without a current allosteric Tyk2 inhibitor R&D program is a procompetitive cure to any antitrust concerns associated with Celgene exercising the Warrant's acquisition rights itself. Accordingly, Celgene and BMS argue that they are highly likely to succeed in their counterclaim for specific performance of the assignment clause and the Warrant's supporting and associated provisions.

Before analyzing each of the three statutory antitrust claims that Nimbus has levied against the Warrant, it is useful to discuss, and reject, two cross-cutting arguments Nimbus presents in its opposition.

First, as discussed above, Nimbus argues that "the Court should doubt the <u>bona fides</u> of Defendants' self-serving representation that they will assign the Warrant to a third party" since they "have not taken any action that would bind them to assign, rather than acquire,

Nimbus's assets." Opp. 19. Again, whether Celgene has bound itself only to assign rather than to acquire is irrelevant to this motion, which seeks to preserve the conditions under which Celgene would be able to complete an assignment if it won its claim for specific performance of that provision. If this Court determines that Celgene is entitled to specific performance of the assignment provision, "the court ha[s] considerable latitude in fashioning the relief," so the "performance required by a decree need not ... be identical with that promised in the contract." NML Capital, 699 F.3d at 262. Therefore, the Court's permanent injunctive relief could limit Celgene only to making an assignment, if that were appropriate.

Second, Nimbus argues that assignment to a third-party pharmaceutical company would not necessarily be procompetitive, because it "would be inescapably plagued by the obvious conflict of interest [Celgene and BMS] face between acting for their own benefit (and selecting a weaker competitor) and acting for the benefit of the public (and selecting a stronger one)." Opp. 20. Nimbus also argues that Celgene could unreasonably delay assignment to give BMS more time without a commercial competitor to deucravacitinib. Id. at 19. These arguments are unlikely to succeed: Nimbus, a sophisticated and counseled entity, agreed to the assignment provision after extended, arms-length negotiation. The final assignment provision constrains Celgene to assign only to a pharmaceutical company "with financial resources and capabilities greater than or substantially similar to those of Celgene." Warrant § 11.2(a)(iii)(z). Crediting Celgene's

reasonable representation that it is seeking to assign the Warrant's purchase right to a third-party pharmaceutical company without an allosteric Tyk2 inhibitor program, making an assignment would increase the number of firms controlling competitors in this developing market. Nimbus is unlikely to succeed in showing that is anticompetitive.

Having addressed these two general arguments, the Court turns to whether Celgene and BMS are likely to succeed in defeating Nimbus's various arguments that Celgene's assignment of the Warrant would violate the antitrust laws. It finds that Celgene and BMS are likely to succeed in repulsing all three antitrust defenses.

i.  **Sherman Act — Section 1**

To prove that assignment under the Warrant violates Section 1 of the Sherman Act, Nimbus "must establish (1) a contract, combination, or conspiracy exists that (2) unreasonably restrains trade." 1-800 Contacts, Inc. v. Fed. Trade Comm'n, 1 F.4th 102, 114 (2d Cir. 2021) (per curiam). The first element is uncontested: The Warrant is "undeniably [a] contract[]." Id. As for the second element, the Second Circuit presumptively applies "rule of reason" analysis to determine whether contracts unreasonably restrain trade. Id. Nimbus does not contend that the Warrant is per se illegal under the Sherman Act, and there is no indication that this is one of those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality," National Soc. of Professional

Engineers v. United States, 435 U.S. 679, 692 (1978).[13] The rule of reason analysis therefore requires Nimbus to "demonstrate that [the] particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006). Rule of reason analysis employs a burden-shifting framework:

> A plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market. After a prima facie case of anticompetitive conduct has been established, the burden shifts to the defendant to proffer procompetitive justifications for the agreement. Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means.

1-800 Contacts, 1 F.4th at 114.

As discussed above, the fact that Celgene may have a conflict of interest in choosing its assignee likely does not render the assignment provision anticompetitive, since the Warrant requires that the assignee have substantially similar or better resources for development of the Tyk2 assets than Celgene. See supra 24; Opp. 20. Nimbus opposes by arguing that Celgene and BMS "offer no support for the assertion that an assignment necessarily would be procompetitive." Opp. 19 (capitalization changed). But that assertion is not only wrong as a matter of fact -- the Motion offers several reasons why it would

---

[13] Nor is so-called "quick look" analysis appropriate, since the assignment provision is not an "inherently suspect" device where "the great likelihood of anticompetitive effects can be easily ascertained." 1-800 Contacts, 1 F.4th at 115.

be procompetitive to assign the Tyk2 acquisition rights to a well-resourced pharmaceutical company without an allosteric Tyk2 R&D program -- but also ignores that Nimbus bears the burden of establishing a prima facie case of anticompetitive effect under the Rule of Reason burden shifting framework, regardless of whether the argument arises in the context of Nimbus's affirmative claims or as an antitrust defense to Celgene's counterclaim for specific performance of the assignment provision. Therefore, the Court holds that Nimbus will likely fail to establish that Celgene's assignment of the Warrant violates Section 1 of the Sherman Act.

ii. **Sherman Act – Section 2**

Nimbus argues that Celgene's exercise of the Warrant violates Section 2 of the Sherman Act, because it allegedly monopolizes the market for allosteric Tyk2 inhibitors. A Section 2 monopolization claim requires a plaintiff to "establish '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 686–87 (2d Cir. 2009). Nimbus might have an argument that Celgene's exercise of the Warrant's Tyk2 acquisition rights would pose a threat of monopolization, but that is irrelevant for the purposes of this motion, which seeks to preserve Celgene's ability to make an assignment. As Celgene argues, "by assigning its rights to a third party that BMS and Celgene do not control and that does not have

-41-

a Tyk2 asset, BMS and Celgene are *increasing* the number of competitors and thus *reducing* any potential power they might have in the relevant markets." Mot. 17. For the same reason, Celgene will also likely defeat the claim that assignment would amount to attempted monopolization under Section 2, which requires a plaintiff to prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Actavis, 787 F.3d at 651. Therefore, Nimbus will likely fail to establish that it would violate section 2 of the Sherman Act for Celgene to make an assignment under the Warrant.

### iii.   **Clayton Act**

Section 7 of the Clayton Act prohibits a transaction if its effect "may be substantially to lessen competition" in any product or geographic market. United States v. Phila. Nat'l Bank, 374 U.S. 321, 355 (1963). Section 7 claims are generally analyzed under a three-step burden shifting framework. At the first step, a plaintiff establishes a prima facie case by showing that the transaction will significantly increase market concentration, thereby creating a presumption that the transaction is likely to substantially reduce competition. See F.T.C. v. H.J. Heinz Co., 246 F.3d 708, 715 (D.C. Cir. 2001). The defendant may then rebut that presumption by undermining the prediction of future anticompetitive effect; if this rebuttal succeeds, the plaintiff has a last-ditch effort to persuade the court that the transaction will substantially harm competition. See id. Here, Nimbus is unlikely to succeed in establishing that assignment to a third-party

pharmaceutical company will substantially lessen competition. Indeed, the fact that assignment would <u>increase</u> the number of well-resourced pharmaceutical companies positioned to develop allosteric Tyk2 inhibitor drugs makes it unlikely that Nimbus could even establish a presumption of anticompetitive effect at the first step of the Section 7 burden shifting framework. Celgene and BMS will thus likely succeed in showing that assignment under the Warrant does not violate Section 7 of the Clayton Act.

In sum, the Court holds that Celgene and BMS are likely to succeed on the merits in establishing each of the components necessary to prevail on their counterclaim for breach of contract and specific performance of the Warrant's assignment provision: (i) the Warrant likely entitles Celgene to make a unilateral assignment, since the FTC issued the parties an HSR Act Second Request; (ii) the August 13 Letter likely did not terminate the Warrant, and Nimbus will likely fail to obtain recission of the Warrant for Celgene's alleged breach of covenants to comply with antitrust laws and cooperate; (iii) Celgene is likely to establish that Nimbus breached the Warrant, including by purportedly terminating the Warrant in the August 13 Letter, and Celgene will likely obtain the remedy of specific performance for that breach; and (iv) Celgene will likely succeed in rebutting Nimbus's claims that the federal antitrust laws prohibit assignment to a third-party pharmaceutical company of the right to purchase Nimbus Lakshmi. The Court thus turns to the next requirement for a preliminary injunction.

B. **Irreparable Harm**

A party seeking a preliminary injunction must demonstrate both that it will suffer an irreparable injury if the injunction does not issue and that it will lack adequate remedies at law to redress those injuries. See Ticor Title Ins. Co. v. Cohen, 173 F3d 63, 68 (2d Cir. 1999). Celgene presents two types of arguments for irreparable harm: (i) that the parties agreed that a breach of the Warrant would result in irreparable harm and (ii) that if Nimbus were to dispose of the Tyk2 asset during this litigation, any money damages available at law would inadequately compensate Celgene and BMS, were they to prevail on their counterclaim for breach.

Celgene and BMS quote a provision of the Warrant in which the parties agree that injunctive relief and specific performance would be an appropriate remedy for breach: "The Parties hereby acknowledge that irreparable damage would occur in the event that any of the provisions of th[e] Warrant were not performed in accordance with their specific terms or were otherwise breached and that the Parties would not have any adequate remedy at law." Warrant § 11.12. This provision expressly states that the "parties shall be entitled to seek an injunction ... to prevent breaches or threatened breaches of this Warrant and to enforce specifically the terms and provisions of this Warrant, in addition to any and all other rights and remedies at law or in equity." Id.

Celgene and BMS further argue that they will suffer irreparable injury in practice for several reasons. Their injury would be

-44-

irreparable, Celgene and BMS aver, because they would be unable to obtain a reasonably certain valuation of the Tyk2 inhibitor molecule to support a damages claim. The molecule is a unique asset that is still in development, meaning its clinical and commercial values are unknown and there remains a risk it will not ultimately receive FDA approval. Celgene and BMS also argue that the value of the right under the Warrant to acquire Nimbus Lakshmi is difficult to calculate at this time because there is no established market for Nimbus Lakshmi shares and this litigation has created significant uncertainty, preventing an accurate valuation by bid solicitation. Reply 5-6. They also contend that the Warrant purports to limit Celgene's monetary damages for breach to $55 million, which is the total amount Celgene invested, so it may be unable to obtain money damages adequate to compensate it for the lost business opportunity if Nimbus disposes of the Tyk2 assets and Celgene later prevails in obtaining a declaration that it is entitled to assign its rights under the Warrant. See Warrant § 9.5.

Celgene has established irreparable injury for reasons similar to those establishing that it will likely obtain specific performance as a remedy for Nimbus's alleged breach of the Warrant. Cf. Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 433 (2d Cir. 1993) (comparing equitable standards for preliminary injunction and specific performance). While Nimbus cites caselaw for the proposition that "the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary

injunctive relief is appropriate," Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987), that point is irrelevant because Celgene and BMS are relying on more than just the parties' agreement that an injunction is appropriate to prevent or respond to breach of the Warrant. Even though Nimbus is right that Celgene's interest in the assignment provision is ultimately financial, it does not disclaim Celgene and BMS's proposed construction of section 9.5 of the Warrant limiting failure-to-close money damages to $55 million, which would only reimburse Celgene's investment (without interest) but not compensate Celgene for the lost revenue from an assignment transaction. See Reply 6. "Even if damages are adequate in other respects, they will be inadequate if they cannot be collected by judgment and execution." NML Cap., 699 F.3d at 262. Finally, Nimbus fails to provide a satisfying response to the proposition that Celgene and BMS cannot reliably value the Tyk2 assets. See Opp. 10. Celgene and BMS's interactions with potential assignees are affected by the uncertainty created by this litigation, so it may not be a reliable valuation indicator. And Nimbus misses the mark with its cases asserting that there is no irreparable injury from a breach of a contract to acquire stock, since Nimbus Lakshmi's shares are illiquid, unlike the publicly traded stock in the cases cited by Nimbus. See Reply 6 n.12 (addressing Nimbus's cases). Finally, it is no answer to argue, as Nimbus does, that Celgene's "sales process could ... continue following trial in this case," since the question at this juncture is whether Celgene could obtain adequate money damages

later on if Nimbus had already disposed of the Tyk2 assets before final judgment issued. See Opp. 10. In that scenario, Celgene could not restart a process to assign the right to purchase assets Nimbus had already disposed of.

Accordingly, the Court holds that if Nimbus sells or otherwise disposes of the Tyk2 assets during the pendency of this litigation Celgene and BMS will suffer irreparable harm, because money damages available at law would inadequately compensate Celgene and BMS were they to prevail on their counterclaims for breach.

C. **Public Interest**

The final requirement is that issuance of the preliminary injunction would be in the public interest. See Actavis PLC, 787 F.3d at 650. Celgene and BMS argue that issuance of the injunction would serve the public interest for two reasons. First, "[t]here is a well-recognized public interest in enforcing contracts and upholding the rule of law." Empower Energies, Inc. v. SolarBlue, LLC, 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016). This is particularly true where, as here, the contract involves sophisticated counterparties who engaged in actual negotiation over the provisions at issue. Second, Celgene and BMS argue that vindicating Celgene's right to profit from its risky investment in Nimbus's allosteric Tyk2 inhibitor program advances the public interest in encouraging investment in pharmaceutical R&D. Letting Nimbus undermine Celgene's option to realize a profit from the success of a drug candidate whose development it financed would, Celgene and BMS argue, discourage future

-47-

partnerships between large, experienced pharmaceutical companies and smaller biotechnology companies that need assistance and funding to bring new technologies to market.

The Court agrees. The value proposition undermining this model for pharmaceutical innovation requires that companies providing financing to early-stage drug candidates be able to realize profits when molecules show promise. It therefore serves the public interest to maintain the status quo while the Court determines whether Nimbus -- a sophisticated, counseled entity that is a repeat player in these contractual arrangements -- should be held to the terms of the financing arrangement it established with Celgene.

The Court also discounts Nimbus's argument that preserving Celgene's ability to assign the Tyk2 purchase rights disserves the public interest because it would violate the antitrust laws, since, as discussed above, Nimbus is unlikely to succeed in proving that assignment would be anticompetitive. See Opp. 24. In any event, if Nimbus prevails on Celgene and BMS's counterclaims, then Nimbus will regain the right to dispose of the Tyk2 assets in another way. Finally, to the extent Nimbus prevails on its substantive Sherman Act and Clayton Act claims, issuance of this preliminary injunction will do nothing to prevent Nimbus from obtaining antitrust damages arising from the Merger.

## V.   **Conclusion**

The Court holds that Celgene and BMS have established that they are likely to succeed on their counterclaim that Nimbus breached the

Warrant and are likely to obtain specific performance of the Warrant's assignment provision as a remedy for that breach. The Court further holds that Celgene and BMS would be irreparably injured if Nimbus disposed of the Tyk2 assets before they obtained judgment on their counterclaim and that issuance of a preliminary injunction prohibiting Nimbus from disposing of the Tyk2 assets is in the public interest. The Court therefore grants Celgene and BMS's motion for a preliminary injunction to preserve the status quo.

The motion asks the Court to preserve the status quo by "preliminarily enjoining Nimbus from taking any actions inconsistent with the Warrant, including but not limited to, selling or otherwise transferring interests in the Tyk2 Asset or Nimbus Lakshmi to third parties, and tolling the time for Celgene or its assignee to exercise the Warrant from the date when Nimbus Lakshmi unilaterally claimed that the Warrant was terminated on August 13, 2021, through the pendency of this litigation." Mot. 25. In its opposition, Nimbus argues that the language of the requested injunction is vague, because a prohibition on "taking any actions inconsistent with the warrant" has an indeterminate scope, considering the many covenants and obligations set forth in the Warrant. See Tr. 20. Celgene and BMS, for their part, maintain that their objective is to preserve their entitlement to assign Celgene's purchase right under the Warrant after the conclusion of this litigation. Counsel for Celgene and BMS acknowledged at argument that it would be sufficient for their purposes to prohibit Nimbus from selling or encumbering the Tyk2 assets while litigation

is pending, and he was unable to identify any other specific action Nimbus might take that it would ask the Court to enjoin. See Tr. 25. Therefore, the Court concludes that it is appropriate to enter an injunction narrower than the one requested in Celgene and BMS's motion.

Counsel for Celgene and BMS also acknowledged that Celgene and BMS contemplated only proceeding with an assignment after receiving a final judgment from this Court. See Tr. 6. Therefore, to preserve the status quo amid the flurry of claims and counterclaims, the Court prohibits Celgene from consummating an assignment transaction under the Warrant while this preliminary injunction remains in force.

The motion also asks the Court to "toll[] the time for Celgene or its assignee to exercise the Warrant from the date when Nimbus Lakshmi unilaterally claimed that the Warrant was terminated on August 13, 2021, through the pendency of this litigation." Mot. 25. Nimbus contends that BMS has an incentive to delay development of Nimbus's allosteric Tyk2 inhibitor drug, since that would give deucravacitinib a competitive advantage in the marketplace. If so, then BMS may try to drag out the Warrant's timelines, perhaps by extending the termination date under section 10.1(e), before assigning the purchase rights to another pharmaceutical company, Nimbus argues. The Court is loath to inadvertently enable such gamesmanship. Therefore, the Court denies Celgene and BMS's present request to toll the Warrants deadlines, without prejudice to revisiting the issue in the future. In any event, Celgene already decided not to deliver a notice of exercise on October 11, 2021, as required under the Warrant, so there

is almost certainly going to be some future dispute over the timeliness of any assignment transaction that proceeds in the future. As Counsel for Celgene and BMS conceded, the Court could take up the issue of whether to extend Celgene's time to complete an assignment transaction, if necessary, after rendering judgment on the counterclaims.

For the foregoing reasons, and as previously ordered on October 14, 2021, Nimbus is hereby preliminarily enjoined, from October 14, 2021 through issuance by this Court of a final judgment on the merits, from selling, transferring, encumbering, or otherwise disposing of, in part or in whole, Nimbus Lakshmi or the intellectual property assets Nimbus Lakshmi holds that are associated with the allosteric Tyk2 inhibitor drug under development. While this preliminary injunction is in place, Celgene shall not consummate an assignment of its purchase rights under the Warrant to any third party pharmaceutical company. The Court declines at this time to toll the deadlines set forth by the Warrant, although Celgene and BMS may raise this issue again should it ultimately prevail on the merits.

SO ORDERED.

New York, NY
November 8, 2021

JED S. RAKOFF, U.S.D.J.